**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 22-cv-1927-WJM-MEH

MICHAEL SEXTON,

      Plaintiff,

v.

SEAN FARIS, Lieutenant for the Denver Police Department, in his individual capacity,
JOHN DOE 1, Supervisory Officer for the Denver Police Department, in his individual
capacity, and
CITY AND COUNTY OF DENVER, a municipality,

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO DISMISS**

---

Before the Court is Defendants Lieutenant Sean Faris, John Doe 1 ("Unknown

Supervisor"), and the City and County of Denver's ("the City") (collectively,

"Defendants") Motion to Dismiss Amended Complaint ("Motion").  (ECF No. 34.)

Plaintiff Michael Sexton filed a response (ECF No. 37), and Defendants filed a reply

(ECF No. 38).  For the following reasons, the Motion is granted in part and denied in

part.

# I. BACKGROUND[1]

### A.    Allegations in the Amended Complaint[2]

Plaintiff is a journalist with a YouTube channel called "Pikes Peak Accountability," where he publishes his videos for public viewing.  (¶ 11.)  On August 25, 2020, the Denver Police Department ("DPD") was forcibly removing homeless people from a homeless encampment.  (¶ 1.)  Protesters openly voiced their demands that the DPD stop their sweeps of the homeless encampments, expressing their disagreement with police's action in Denver.  (*Id.*)

### 1.    Lieutenant Faris

DPD set up a perimeter by holding up yellow tape to separate the protesters from the police operation.  (¶ 2.)  Plaintiff began filming the event with a cell phone, including interactions with DPD, and made some statements with respect to police actions in protest of DPD's abusive conduct.  (¶ 2.)

> Without provocation or legal basis, Denver Police Officer Lt. Faris walked up to Mr. Sexton, who had been lawfully standing behind a temporary perimeter established for lawful protests while holding his camera directly above his head with his hands clearly visible filming Denver Police's treatment of the homeless community, and recklessly sprayed him directly in the eyes with OC pepper spray, causing him extreme pain, temporary blindness, and an extended period of agony.

---

[1] The Court observes that typographical and grammatical errors permeate the Amended Complaint ("AC") that make it difficult to understand at times.  (ECF No. 33.)  Plaintiff's response brief suffers similar deficiencies, including the fact that his counsel fails to provide the full Westlaw or LexisNexis citation for some cases or italicize or underline the names of cases, as is standard practice.  Plaintiff's counsel is directed to carefully proofread and edit his filings in the future.

[2] The Background is drawn from the AC.  (ECF No. 33.)  The Court assumes the allegations contained in the AC to be true for the purpose of deciding the Motion.  *See Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  Citations to (¶ __), without more, are references to the AC.

(¶ 2.)  Plaintiff was not arrested or charged with any criminal wrongdoing.  (¶ 3.)  Plaintiff alleges that Lieutenant Faris's "hate and disdain for Mr. Sexton was evidenced by his anger and facial expressions expressed immediately during this hostile interaction and is indicative of a malicious and sadistic intent to injure an innocent citizen."  (¶ 15.) Further, Plaintiff alleges that Lieutenant Faris and Unknown Supervisor

> knew very well that [he] was a peaceful protestor, and that he had been lawfully participating in a public protest of law enforcement misconduct in furtherance of his First Amendment right to protest and was legally filming the police.  In direct response to Mr. Sexton's exercise of his civil right to protest law enforcement misconduct and to film police. [*sic*]  Defendant Faris and Unknown Supervisor recklessly and intentionally attacked Mr. Sexton, or allowed him to be attacked, with complete disregard for Mr. Sexton's First Amendment right to protest and to film the police.  In fact, this abusive and retaliatory conduct was taken with the direct intention of violating Mr. Sexton's civil rights.  But for Mr. Sexton's exercise of his right to protest, Defendant Faris and Unknown Supervisor would not have attacked him or allowed him to be attacked.

(¶ 17.)  Plaintiff alleges that Lieutenant Faris and Unknown Supervisor's "malicious conduct and reckless failure to intervene occurred during Mr. Sexton's lawful exercise of his protected right to collect video footage and public protest."  (¶ 19.)  He further alleges that "this adverse action within a temporal proximity is indicative of Faris and Unknown Supervisor's retaliatory motive to chill Mr. Sexton's speech and documentation of this public protest."  (*Id.*)

2.   Unknown Supervisor

Plaintiff alleges that Unknown Supervisor was present during the protests against law enforcement and witnessed him peacefully assemble and videotape the protest.  (¶ 23.)  He alleges that Unknown Supervisor failed to intervene to prevent "this retaliatory

and unconstitutional attack against an innocent citizen, allowing [Plaintiff] to be sprayed in the eyes with a dangerous chemical." (*Id.*) Further, Unknown Supervisor allegedly knew that Plaintiff would likely temporarily lose his vision without an opportunity to flush his eyes out due to the absence of an immediately available wash station. (*Id.*) Unknown Supervisor, along with Lieutenant Faris, allegedly refused to comply with the City's policy to provide Plaintiff medical attention and access to a flush station. (¶ 24.)

       3.   <u>Municipal Liability</u>

      With respect to municipal liability, Plaintiff alleges that

> Defendant Faris and the Unknown Supervisor intentionally chilled Mr. Sexton's free speech in furtherance of the widespread and well accepted policies of the City and County of Denver and its agencies, namely the Denver Police Department, specifically a Cowboy culture and its derivative and pervasive attacks against citizens for contempt of cop often characterized as attitude arrests. This Cowboy culture within the Denver Police Department has existed for decades and is maintained off the books due to Denver's consistent effort to cover-up the misconduct of officers by falsifying reports or turning a blind eye to the use of excessive force, and persistent refusal to discipline officers for their deliberate violation of internal policies and Federal law enforcement standards.

(¶ 21.) He further alleges that through DPD, the City has had "long standing and widespread policies, customs, and/or practices that allowed the acts described herein, specifically Faris'[s] abusive use of force against Mr. Sexton and chilling of his free speech, which were necessarily and consciously approved by Mayor Hancock, Chief of Police Pazen, and Safety Manager Robinson[.]" (¶ 25.) According to Plaintiff, "[o]fficial policy makers Mayor Hancock, Chief of Police Pazen, and Safety Manager Robinson have final decision-making authority over the [DPD] and its staff, and are responsible for the operations, practices, and totality of conditions of the [DPD], Denver acts and fails

[*sic*] to act through its official policy makers, whose acts and omissions represent the policy, practices, and customs of [the City]."  (¶ 26.)

> a.    *Customs, Policies, Practices*

Plaintiff lists the City's policies and practices that he alleges are the "driving force" behind Defendants' alleged violations of his civil rights, including:

> a.      Cowboy culture and attitude arrest, designed to punish citizens for opposing Denver Police and inadequate training thereon;
>
> b.      Targeted attack of protester by Denver Police and inadequate training thereon;
>
> c.      Failure to give audible dispersal order before the use of force and failure to train thereon;
>
> d.      Indiscriminate and inappropriate use of chemical munitions such as tear gas, an [*sic*] inadequate training thereon;
>
> e.      Indiscriminate and inappropriate use of Pepper Ball, including as a crowd control/dispersal measure or on anyone disrupting traffic and without warning, and inadequate training thereon;
>
> f.      Inappropriate use of pepper spray and inadequate training thereon;
>
> g.      Failure to require officers to complete time [*sic*] use-of-force reports, which negatively impact officer accountability, and failure to train thereon;
>
> h.      Inadequate Body Worn Camera activation during crowd-control situations and failure to train thereon;
>
> i.      Failure to discipline officers for the excessive use of force; and failure to train thereon; and
>
> j.      Dictating the rules of engagement for mutual assistance agencies from outside jurisdiction while simultaneously allowing agencies to follow their own policies.

(¶ 27.)  He also alleges that the City, through the DPD and its official policymakers, has a custom and widespread practice of failing to comply with its own written policies, including: "(1) First Amendment protests; (2) retaliation against citizens; (3) reporting official misconduct; (4) investigating the use of force by personnel against citizens; (5) use of force and/or pepper spray; (6) discharging and/or disciplining officers for misconduct; and (7) discharging and/or disciplining officers for concealing misconduct." (¶ 39.)

In the AC, Plaintiff identifies various moments on May 28, 2020 that he alleges demonstrate DPD's "inappropriate use of pepper spray during the GFP[3]."  (¶¶ 40–47.) He alleges DPD exhibited a "widespread practice and custom of failing to give dispersal orders or audible dispersal orders prior to use of force."  (¶ 48.)

      b.   *Failure to Train, Supervise, and/or Discipline*

Plaintiff alleges that the City, through its official policymakers Hancock, Pazen, and Robinson, "failed to properly train, supervise, and/or discipline its subordinates Faris, Unknown Supervisor, and others to: (1) prevent the unnecessary use of force against citizens; (2) prevent Denver's widespread Cowboy Culture and attitude arrests; (3) prevent attacks against citizen[s] who protest police misconduct; (4) prevent the cover-up of official misconduct; and (5) ensure that law enforcement are discharged or properly discipline [*sic*] for the intentional misconduct."  (¶ 59.)  Allegedly, "Hancock, Pazen, and Robinson, as superior officers, are responsible for the training supervision and discipline of personnel at the [DPD]."  (¶ 60.)  Plaintiff further alleges that

        the clear lack of proper training and supervision with respect

---

[3] Although Plaintiff does not explain the meaning of this acronym, the Court presumes he means "George Floyd Protests."

> to the above stated deficiencies, and likelihood that this
> inadequate training and supervision would result in the
> transgression of persons [*sic*] constitutional rights such as
> those described herein, the fact that these superior officers
> fail to train and properly supervise, amounts to deliberate
> indifference to the constitutional rights of persons with whom
> the [DPD] and its personnel come into contact with [*sic*],
> including [Plaintiff].

(*Id.*)

Accordingly, Plaintiff requests that the Court enter judgment in his favor and against Defendants, jointly and severally, and grant appropriate relief at law and equity; economic losses on all claims allowed by law; compensatory and consequential damages; punitive damages; attorney's fees and costs; and pre-judgment and post-judgment interest.  (ECF No. 33 at 35–36.)

## B.    Procedural History

On August 3, 2022, Plaintiff filed this civil rights lawsuit.  (ECF No. 1.)  He filed the AC on November 19, 2022, bringing three claims against Defendants: (1) excessive force in violation of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983; (2) denial of free speech in violation of the First Amendment pursuant to § 1983; and (3) retaliation in violation of the First Amendment pursuant to § 1983.  (ECF No. 1.)  He also brings a *Monell* claim against the City under numerous theories of municipal liability.

## II. LEGAL STANDARD

Under Rule 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted."  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201

(10th Cir. 2003) (internal quotation marks omitted).

The Rule 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff." *Ridge at Red Hawk*, 493 F.3d at 1177. Thus, in ruling on a Motion to Dismiss under Rule 12(b)(6), the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted). "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). However, "[t]he burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). "[C]omplaints that are no more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,' . . . 'will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

## III. ANALYSIS

### A.    Claim 1: Excessive Force in Violation of the Fourteenth Amendment

1.    <u>Legal Framework</u>

Before addressing the merits of the parties' arguments on Claim 1, the Court

must address their disagreement regarding the applicable legal standard for Plaintiff's excessive force claim pursuant to the Fourteenth Amendment.

"Claims that state actors used excessive force—deadly or not—in the course of a seizure are analyzed under the Fourth Amendment's reasonableness standard." *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1243 (10th Cir. 2003) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  Accordingly, a plaintiff "must show both that a 'seizure' occurred and that the seizure was 'unreasonable.'" *Id.* (quoting *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989)).  The Supreme Court has held that "[a] person is seized within the meaning of the Fourth Amendment when a reasonable person would believe that he or she is not free to leave." *Florida v. Bostick*, 501 U.S. 429, 435 (1991) (internal quotation marks omitted).

A determination that a plaintiff was not seized within the meaning of the Fourth Amendment does not end the inquiry, however. *Roska*, 328 F.3d at 1243.  "Substantive due process analysis is appropriate in cases that involve excessive force where a specific constitutional provision—such as the Fourth or Eighth Amendment—does not apply." *Id.* (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 843(1998) ("'*Graham* simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.'  Substantive due process analysis is therefore inappropriate in this case only if respondents' claim is 'covered by' the Fourth Amendment.")).

The Fourteenth Amendment protects citizens against state actions that deprive them of life, liberty, or property without due process of law.  U.S. CONST. amend. XIV.

In the Tenth Circuit, a court examines three factors in determining whether force was excessive within the meaning of the Fourteenth Amendment: (1) the relationship between the amount of force used and the need presented; (2) the extent of the injury inflicted; and (3) the motives of the state actor. *Roska*, 328 F.3d at 1243 (citation omitted).  Force inspired by malice or by "unwise, excessive zeal amounting to an abuse of official power that shocks the conscience . . . may be redressed under [the Fourteenth Amendment]." *Id.* (citation omitted).

Here, Plaintiff does not allege that a seizure occurred.  (*See* ECF No. 33.) Moreover, in his response, he apparently recognizes that a claim such as his, which "fail[ed] to evolve into a seizure," mandates a substantive due process analytical framework; however, he simultaneously asserts that the use of force in this case is "properly assessed under the objective reasonableness standard applied to Fourth Amendment excessive force claims."  (ECF No. 37 at 5.)

For support, he relies on *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), in which the Supreme Court held that a plaintiff may establish an excessive force claim under the Fourteenth Amendment based exclusively on objective evidence.  *Id.* at 397.  In a subsequent case examining *Kingsley*, the Tenth Circuit explained that "[b]y its own words, the Supreme Court decided that 'an objective standard is appropriate in the context of excessive force claims brought by pretrial detainees pursuant to the Fourteenth Amendment'—nothing more, nothing less."  *Strain v. Regalado*, 977 F.3d 984, 991 (10th Cir. 2020) (citation omitted).

Despite the Tenth Circuit's clarifying language concerning what *Kingsley* did and did not hold, Plaintiff now argues that in *Kingsley*, "the Supreme Court extended the

objective reasonable standard generally applied to Fourth Amendment seizures to a Fourteenth Amendment excessive force claim."  (ECF No. 37 at 5.)  He cites no other cases whatsoever on this point, much less any cases extending *Kingsley* beyond pretrial detainees in the manner he suggests.  (*Id.* at 5–6.)

Defendants argue that Plaintiff's interpretation "stretches the reasoning in *Kingsley* beyond the Court's intention," observing that the Supreme Court did not address whether the "shock[s] the conscience" standard or the "objective reasonableness" standard applied to Fourteenth Amendment excessive force claims. (ECF No. 38 at 1–2.)  The Court agrees.  Plaintiff cites no case law extending *Kingsley* in the manner he suggests (to plaintiffs who are not pretrial detainees), and the Court is unaware of any such ruling in the Tenth Circuit.  Application of *Kingsley* by the Tenth Circuit appears limited to cases involving pretrial detainees.  *See, e.g.*, *Wise v. Caffey*, 72 F.4th 1199 (10th Cir. 2023) (pretrial detainee filed § 1983 action alleging excessive force against detention officer); *Knighten v. Ramsey*, 2023 WL 2998424, at *2 (10th Cir. Apr. 19, 2023) (pretrial detainee alleged deputy violated Fourteenth Amendment right to be free from excessive force by dumping him out of his wheelchair; *Nosewicz v. Janosko*, 2021 WL 2179300 (10th Cir. May 28, 2021) (pretrial detainee taken to ground by deputy sheriff brought § 1983 claim for excessive force in violation of Fourteenth Amendment).

Rather, in cases like this one where the Fourth or Eighth Amendments do not apply, District of Colorado judges routinely apply the shocks the conscience standard. *See, e.g.*, *Sanchez v. Guzman*, 2022 WL 4844462, at *3 (D. Colo. Aug. 30, 2022) (applying shocks the conscience standard in Fourteenth Amendment substantive due

process context); *Adkins v. City of Colorado Springs*, 2021 WL 810107, at *5 (D. Colo. Mar. 3, 2021) (same).  Therefore, the Court rejects Plaintiff's suggestion that the objective reasonableness standard applies.  Instead, the Court will apply the substantive due process analytical framework.

2.    Lieutenant Faris

Defendants argue that Plaintiff fails to state a claim for excessive force because his "allegations are entirely conclusory and lack the necessary factual enhancement to credit the allegations of subjective intent."  (ECF No. 34 at 3.)  Defendants further contend that Plaintiff fails to allege "facts demonstrating he was specifically targeted." (*Id.* at 4.)

a.    *Proportionality*

The Court first considers "whether the challenged conduct bears a reasonable justification in the service of a legitimate governmental objective or if instead it might be characterized as arbitrary, or conscience-shocking."  *Adkins*, 2021 WL 810107, at *5 (quoting *Lindsey v. Hyler*, 918 F.3d 1109, 1115–16 (10th Cir. 2019)) (internal quotation marks omitted).  "[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense."  *Id.* (citations omitted).  "Challenged actions must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience-shocking."  *Id.* (citations omitted).  "Indeed, not even 'intentionally or recklessly causing injury through the abuse or misuse of government power is enough.'" *Id.* (citations omitted).

Here, Plaintiff alleges that "[w]ithout provocation or legal basis, Denver Police Officer Lt. Faris walked up to Mr. Sexton, who had been lawfully standing behind a temporary perimeter established for lawful protests while holding his camera directly

above his head with his hands clearly visible filming Denver Police's treatment of the homeless community, and recklessly sprayed him directly in the eyes with OC pepper spray, causing him extreme pain, temporary blindness, and an extended period of agony." (¶ 2.) The AC is devoid of allegations from which the Court might infer that Plaintiff posed a safety threat to Lieutenant Faris or anyone else at the protest or other conduct which might have justified Lieutenant Faris's actions. Therefore, these allegations, taken as true, plausibly suggest that the amount of force used by Lieutenant Faris was disproportionate to the need presented. *Cf. DeSpain v. Uphoff*, 264 F.3d 965, 978 (10th Cir. 2001) (stating in Eighth Amendment context that "pepper spray is an instrument with which prison officers wield their authority, or force, and thus its use implicates the excessive use of force").

> b.   *Extent of Injury*

The next due process factor addresses "the extent of the injury inflicted." *Estate of Booker v. Gomez*, 745 F.3d 405, 423 (10th Cir. 2014). Defendants do not directly challenge the sufficiency of the allegations of injury. (*See* ECF No. 34.) Regardless, the Court concludes that Plaintiff has alleged injuries resulting from being pepper sprayed, such as "extreme pain, temporary blindness, and an extended period of agony," (¶ 2), sufficient to withstand Rule 12 scrutiny.

> c.   *Motive*

The Court next considers Lieutenant Faris's motive. *Estate of Booker*, 745 F.3d at 423. Force is deemed to be "excessive" under the Fourteenth Amendment, only if it is "inspired by malice or by unwise, excessive zeal amounting to an abuse of official power that shocks the conscience." *Id.* (quoting *Roska*, 328 F.3d at 1243). "The level of culpability required for action to shock the conscience largely depends on the context

of the action."  *Browder v. Casaus*, 675 F. App'x 845, 847 (10th Cir. 2017)  "[T]he intent to harm standard most clearly applies in rapidly evolving, fluid, and dangerous situations which preclude the luxury of calm and reflective deliberation."  *Green v. Post*, 574 F.3d 1294, 1301 (10th Cir. 2009) (quoting *Perez v. Unified Gov't of Wyandotte Cnty./Kan. City, Kan.*, 432 F.3d 1163, 1167 (10th Cir. 2005)).  However, "when actual deliberation is practical," the officer's actions need only exhibit "conscious, deliberate indifference to an extreme risk of very serious harm to the plaintiff" to violate the Fourteenth Amendment.  *Id.* at 1301, 1303.

In evaluating whether an officer acted with deliberate indifference, a court must assess "the circumstances that surround the conduct at issue and the governmental interest at stake."  *Green*, 574 F.3d at 1302 (quoting *Radecki v. Barela*, 146 F.3d 1227, 1231 (10th Cir. 1998)); *see Bublitz v. Cottey*, 327 F.3d 485, 490 (7th Cir. 2003) ("To rise to the level of a constitutional violation, a deliberately indifferent act must be one which is conscience-shocking—the Supreme Court has acknowledged that not every deliberately indifferent action will rise to the 'constitutionally shocking level.'").

Defendants argue that Plaintiff's contentions with respect to the third element of his excessive force claim are "entirely conclusory."  (ECF No. 34 at 4.)  They further contend that while "Plaintiff alleges that he was sprayed in the face with pepper spray, he fails to allege any facts demonstrating he was specifically targeted."  (*Id.*)  In response, Plaintiff argues that "[Faris's] malicious and sadistic intent—Faris'[s] angry facial expressions, is indicative of excessive force."  (ECF No. 37 at 8 (citing ¶ 15).)

The Court concludes that Plaintiff has failed to allege the final element of his excessive force claim with sufficient factual particularity to satisfy his high burden.  As

Defendants emphasize, his allegations of Lieutenant Faris's motive are conclusory and, in the undersigned's view, not sufficient to satisfy the standard of shocking the conscience.  Accordingly, the Motion is granted with respect to Claim 1 as to Lieutenant Faris.

**B.**   **Claim 2: Denial of Free Speech in Violation of the First Amendment**

Defendants argue that Plaintiff's denial of free speech claim fails because he does not identify a content-based restriction, ordinance, law, or regulation acting as a prior restraint.  (ECF No. 34 at 4–5.)  In *Sodaro v. City & Cnty. of Denver*, 629 F. Supp. 3d 1064, 1077 (D. Colo. 2022), the undersigned addressed a related argument in a civil rights case with comparable facts.[4]  Sodaro attended the inauguration ceremony of Denver Mayor Michael Hancock in July 2019, where she approached a temporary fence, expressed her disagreement with the mayor on his treatment of the homeless, and stated "stop harassing the homeless."  *Id.* at 1071.  She was immediately arrested by DPD officers.  *Id.*  Similar to this case, Sodaro asserted a First Amendment free speech claim and a First Amendment retaliation claim.  *Id.* at 1072.

In *Sodaro*, the Court dismissed Sodaro's First Amendment free speech claim as duplicative of her retaliation claim.  *Id.* at 1078.  The undersigned reasoned that Plaintiff failed to "allege any preemptively proscriptive action taken by Defendants to deprive her of her First Amendment rights."  *Id.*  Thus, [a]bsent this showing, and considering that all of the Officers' actions occurred in response to the activities that Plaintiff contends were constitutionally protected, the Court [was] uncertain how it could analyze Plaintiff's claim

---

[4] The Court notes that Attorney Kenneth Burton, who represents Plaintiff in this case, also represents Sodaro.

as anything but a claim for retaliation." *Id.* Therefore, the Court dismissed Plaintiff's First Amendment denial of free speech claim without prejudice as duplicative of her First Amendment retaliation claim. *Id.* (citing *Valdez v. New Mexico*, 109 F. App'x 257, 263 n.4 (10th Cir. 2004) (concluding that the plaintiff had "not stated a First Amendment claim in any context" where the court could "discern no distinction" between the plaintiff's First Amendment retaliation claim and his claim alleging a direct denial of his First Amendment rights)).

The Court finds that the reasoning in *Sodaro* applies here. Like Sodaro, Plaintiff has failed to allege "preemptively proscriptive action" by Defendants. (ECF No. 33.) He points out that he has alleged that Lieutenant Faris sprayed him with mace and that Unknown Supervisor failed to intervene to prevent this act. (ECF No. 37 at 10.) However, as the undersigned reasoned in *Sodaro*, the Court is uncertain how it can analyze Plaintiff's claim as anything but a First Amendment retaliation claim. Therefore, the Motion is granted to the extent that the Court dismisses Plaintiff's First Amendment denial of free speech claim without prejudice, as it is duplicative of his First Amendment retaliation claim.[5]

---

[5] Plaintiff argues that Claims 2 and 3 are not duplicative. (ECF No. 37 at 11.) "Assuming arguendo that the claim could be construed as duplicative, the Plaintiff will elect to proceed with denial of free speech under the First Amendment for Claim Two, and retaliation for exercise of right of free press under the First Amendment for Claim Three." (*Id.*) The Court will not instruct Plaintiff as to how he may replead his complaint, if he chooses to do so, but notes that his explanation for the alternative claims is woefully underdeveloped and would require significant improvement and citation to authority on amendment.

Moreover, at this juncture, the Court is persuaded by Defendants' argument that, in addition to being duplicative of Claim 3, Plaintiff has failed to identify a clear prior restraint with respect to Claim 2, and that claim is alternatively dismissed without prejudice on this basis as well. *See Weise v. Colorado Springs*, 421 F. Supp. 3d 1019, 1039 (D. Colo. 2019) (dismissing First Amendment claim after plaintiff failed to identify a court order, specific law, regulation, or policy that operated as a prior restraint on the exercise of her First Amendment rights).

**C.**     **Claim 3: Retaliation in Violation of the First Amendment**

To establish a claim of retaliation for exercising one's First Amendment rights, a plaintiff must show that: (1) he was engaged in a constitutionally protected activity; (2) the defendants' actions caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in the activity; and (3) his exercise of the constitutionally protected activity substantially motivated the defendants' adverse action. *Sodaro*, 629 F. Supp. 3d at 1076 (citing *Van Deelen v. Johnson*, 497 F.3d 1151, 1155–56 (10th Cir. 2007)).

Defendants contend that Plaintiff has failed to satisfy the third element of his retaliation claim.[6]  Specifically, they argue that "his speculative allegations that Lt. Faris sprayed him with pepper spray with the intent of punishing him for exercising his free speech are not plausible."  (ECF No. 34 at 6.)

The Court disagrees.  The AC states that Plaintiff's "free speech was met with violent force designed to chill his protest," "Faris aggressively sprayed Mr. Sexton with mace in the eye and face to cause him serious harm," and this "malicious and humiliating conduct was . . . designed to deter Mr. Sexton speaking out against Denver Police and filming this abusive conduct for publication."  (¶ 95.)  Based on these allegations, the Court concludes that Plaintiff has adequately alleged that Lieutenant Faris's motivation for pepper spraying him was to retaliate against him for filming DPD's actions with respect to the homeless.  *See Gee v. Pacheco*, 627 F.3d 1178, 1189 (10th Cir. 2010) (finding that the plaintiff adequately stated a retaliation claim when he alleged

---

[6] Because Defendants do not contest that Plaintiff has satisfied the first two elements of his retaliation claim, the Court will not discuss them.

that defendants were aware of the plaintiff's protected activity and that the defendants'

adverse action was taken in close temporal proximity to the protected activity).  The

Motion is denied with respect to Claim 3 as to Lieutenant Faris.

**D.    Failure to Intervene Claim Against Unknown Supervisor[7]**

In this Circuit, an officer can be liable for a failure to intervene when he: (1)

observed a constitutional violation and (2) had a realistic opportunity to intervene.

*Mullins v. City of Colorado Springs*, 575 F. Supp. 3d 1360, 1372–73 (D. Colo. 2021)

(citing *Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015); *Mick v. Brewer*, 76 F.3d

1127, 1136 (10th Cir. 1996) (holding that it is well established that a police officer has a

duty to intervene to prevent use of excessive force by another police officer)).

With respect to Unknown Supervisor, Plaintiff alleges:

> 23. The Unknown Supervisor was present during the
> protests against law enforcement, and witnessed Mr. Sexton
> peacefully assemble in the designated area as he
> videotaped the public protest.  The Unknown Supervisor
> witnessed this public protest against Denver law
> enforcement, and despite his ability and authority to prevent
> or stop any unlawful attacks against the protestors, in
> furtherance of Denver's Cowboy culture, the well
> documented practice of attitude arrests for contempt of cop,
> and violent treatment of protestors, the Unknown Supervisor
> failed to intervene to prevent this retaliatory and
> unconstitutional attack against an innocent citizen, allowing
> Mr. Sexton to be sprayed in the eyes with a dangerous
> chemical.  This sadistic conduct was taken with knowledge
> that Mr. Sexton would likely lose his vision without an
> opportunity to flush his eyes out due to the absence of a
> wash station or water source that was immediately available,

---

[7] The manner in which Plaintiff has pled claims against Unknown Supervisor is unclear. There is no independent claim against Unknown Supervisor for failure to intervene.  Instead, it appears that Plaintiff alleges a failure to intervene claim against Unknown Supervisor within each of his three main claims.  Therefore, the Court concludes that Plaintiff has not asserted that Unknown Supervisor should be held liable under a supervisory liability theory.  Regardless, the Court addresses Plaintiff's allegations against Unknown Supervisor as to all three claims under the umbrella of a § 1983 claim against Unknown Supervisor for failure to intervene.

> which would increase the likelihood of injury and exacerbate his suffering.
>
> 24. The Unknown Supervisor and Officer Faris refused to comply with Denver's policy and duty to provide Mr. Sexton medical attention and access to a flush station to remove the dangerous chemical that they sprayed in his eyes, which shows a malicious and sadistic intent to injure Mr. Sexton in direct violation of the Fourteenth Amendment right to be free from outrageous governmental conduct.

(¶¶ 23–24.)

Defendants contend that Plaintiff's claim for excessive force against Unknown Supervisor "appears to rest on a bald allegation that an unknown supervisor 'failed to intervene to prevent this retaliatory and unconstitutional conduct against innocent citizens.'"  (ECF No. 34 at 4.)  In response, Plaintiff merely restates the conclusory allegations peppered throughout the AC, stating that he has "specifically alleged that Faris and Unknown Supervisor's action of spraying him in the eyes with mace and failure to intervene to prevent this excessive use of force constituted substantial interference preventing Mr. Sexton from adequately collecting meaningful video footage and protesting police misconduct."  (ECF No. 37 at 10.)

Upon review, the Court finds that the allegations against Unknown Supervisor in the AC are mere legal conclusions.  The only allegation that even mentions temporal proximity—which might indicate that Unknown Supervisor had an opportunity to intervene—is completely conclusory (and almost does not make sense in and of itself). (¶ 19 ("This adverse action within a temporal proximity is indicative of Faris and Unknown Supervisor's retaliatory motive to chill Mr. Sexton's speech and documentation of this public protest.").)  The Court cannot conclude that Plaintiff has alleged that Unknown Supervisor had a realistic opportunity to intervene; in fact, it is

unclear from the vague, conclusory allegations in the AC whether Unknown Supervisor ever actually saw Lieutenant Faris pepper spray Plaintiff.  The allegations against Unknown Supervisor are woefully inadequate.

Allegations of an officer's "mere presence at the scene and [his] failure to stop any of the alleged constitutional violations committed by their fellow officers" is not sufficient to state a claim for failure to intervene.  *Sodaro*, 629 F. Supp. 3d at 1076 (quoting *Bark v. Chacon*, 504 F. App'x 741, 746 (10th Cir. 2012)).  In the absence of more specific and substantive factual allegations against Unknown Supervisor, the Court must conclude that Plaintiff has failed to state a claim against him.  As a result, the Motion is granted to the extent that all claims are dismissed without prejudice insofar as they are brought against Unknown Supervisor.

**E.**     **Municipal Liability**

    1.     <u>Legal Framework</u>

Section 1983 imposes liability on

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . .

42 U.S.C. § 1983.  The Supreme Court held in *Monell v. Department of Social Services* that "person," as used in this statute, includes "municipalities and other local government units," more specifically, "local government units which are not considered part of the State for Eleventh Amendment purposes."  436 U.S.at 691 & n.54 (1978).

However, a local government unit can be liable for damages under § 1983 only when its "policy or custom, whether made by its lawmakers or by those whose edicts or

acts may fairly be said to represent official policy, inflicts the [constitutional] injury." *Id.*

at 694.  The Supreme Court has thus "required a plaintiff seeking to impose liability on a

municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the

plaintiff's injury," thereby "ensur[ing] that a municipality is held liable only for those

deprivations resulting from the decisions of its duly constituted legislative body or of

those officials whose acts may fairly be said to be those of the municipality," rather than

holding the municipality liable simply because it employed a constitutional wrongdoer.

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403–04 (1997).

> The relevant policy or custom can take several forms, including:

> > (1) a formal regulation or policy statement; (2) an informal
> > custom amounting to a widespread practice that, although
> > not authorized by written law or express municipal policy, is
> > so permanent and well settled as to constitute a custom or
> > usage with the force of law; (3) the decisions of employees
> > with final policymaking authority; (4) the ratification by such
> > final policymakers of the decisions—and the basis for
> > them—of subordinates to whom authority was delegated
> > subject to these policymakers' review and approval; or (5)
> > the failure to adequately train or supervise employees, so
> > long as that failure results from deliberate indifference to the
> > injuries that may be caused.

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal quotation

marks and alterations omitted).  But, whatever species of policy or custom is alleged,

> > [t]he plaintiff must also demonstrate that, through its
> > *deliberate* conduct, the municipality was the "moving force"
> > behind the injury alleged.  That is, a plaintiff must show that
> > the municipal action was taken with the requisite degree of
> > culpability and must demonstrate a direct causal link
> > between the municipal action and the deprivation of federal
> > rights.

*Bryan County*, 520 U.S. at 404 (emphasis in original).[8]

---

[8] In *Trujillo v. City & Cnty. of Denver*, the undersigned stated in *dicta* that the distinction

According to Plaintiff, his municipal liability claim against the City is based on: (1) questionable formal policies; (2) informal custom; (3) failure to train, supervise, or discipline; and (4) ratification.  (ECF No. 37 at 13.)

2.   Analysis

While Defendants dispute the sufficiency of Plaintiff's allegations with respect to all three elements—policy, causation, and state of mind—of his municipal liability claim (ECF No. 34 at 7–16), for the sake of judicial efficiency, the Court will not analyze each element independently.  Instead, the Court agrees with Defendants and concludes that Plaintiff's allegations as to the third element are sufficiently factually deficient as to justify dismissing this claim.

"[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences."  *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770–71 (10th Cir. 2013) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520

---

between an unwritten policy or custom theory and a failure to train theory of municipal liability is "potentially significant because a failure to train theory requires proof of deliberate indifference, whereas a policy/custom theory does not."  2017 WL 1364691, at *4 (D. Colo. Apr. 14, 2017). The Court read *Connick v. Thompson*, 563 U.S. 51 (2011), *City of Canton*, and *Bryson*, as suggesting this distinction but did "not distinguish Trujillo's two possible theories" because it found he had plausibly alleged deliberate indifference.  *Trujillo*, 2017 WL 1364691, at *4.  Nor did the parties in *Trujillo* cite *Schneider* for the proposition that all *Monell* claims have a state of mind element, regardless of which theories are used to show the policy or custom element of municipal liability.

Nevertheless, the Court's application of *Schneider* in this case is consistent with how the Court generally approaches the municipal liability analysis.  It also reflects the manner in which the Tenth Circuit approaches municipal liability following *Bryan County*.  *See, e.g.*, *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1235 (10th Cir. 2020) (allegations of a policy or custom of unlawful strip searches also require plaintiff to allege state of mind element).

U.S. 397, 407 (1997)).

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm.  In most instances, notice can be established by proving the existence of a pattern of tortious conduct.  In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction[.]

*Id.* (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998)).  The Tenth Circuit explains that "the prevailing state-of-mind standard for a municipality is deliberate indifference regardless of the nature of the underlying constitutional violation."  *Id.* at 770 n.5 (citing Martin A. Schwartz, *Section 1983 Litigation Claims & Defenses* at § 6.02[C] (2013) ("Since the decision in [*City of Canton v. Harris*, 489 U.S. 378, 389 (1989)] [adopted deliberate indifference for training claims], deliberate indifference has become the prevailing standard for other types of municipal liability claims as well. . . . [W]hen a § 1983 claimant seeks to impose municipal liability she must normally show deliberate indifference."); *id.* at § 7.07 ("The deliberate indifference standard has . . . played a pervasive role in the law of § 1983 municipal liability.")).

Defendants argue that Plaintiff has failed to allege facts supporting the element of deliberate indifference.  (ECF No. 34 at 15–16.)  The Court agrees.  The only clear allegation of deliberate indifference in the AC is "the fact that these superior officers fail to train and properly supervise, amounts to deliberate indifference to the constitutional rights of persons, including [Plaintiff] with whom the [DPD] and its personnel come into contact with."  (¶ 60.)  This lone conclusory allegation of the City's deliberate

indifference is insufficient.  In his response, Plaintiff unhelpfully points the Court toward ¶¶ 26–43—nearly one quarter of his AC—to support his failure to train, supervise, and discipline theory of municipal liability.  (ECF No. 37 at 19–20.)  He seems to ignore the fact that all of his theories of liability, not just the failure to train theory, require sufficient factual allegations of deliberate indifference.  Like the AC, Plaintiff's response is replete with conclusory arguments and broad, frenetic statements, which are of little help to the Court in analyzing the sufficiency of his claims.

As such, the Court finds that Plaintiff has not sufficiently pled deliberate indifference and has failed to state a claim for municipal liability.

***

Although the Court will not analyze the sufficiency of Plaintiff's allegations regarding the first and second elements of municipal liability, the Court will provide some guidance to Plaintiff in the event he opts to file a second amended complaint. The AC is generally full of legal arguments and conclusory allegations, which have created an unwieldy, bloated pleading which makes it difficult for the undersigned to separate facts from excessive attorney argument.  Additionally, Plaintiff employs lengthy lists throughout his AC and his brief, which similarly make it difficult to discern precisely what theories of municipal liability he asserts.  For instance, he lists various policies and practices in paragraph 27 of the AC, and in his response brief, appears to list several of those same policies as examples of failures to train (ECF No. 37 at 20).  After reading Plaintiff's 37-page AC, counsel for Defendants could not even conclusively determine whether he had alleged an unconstitutional policy or custom due to ratification.  (ECF No. 34 at 8 n.1 ("Plaintiff does not appear to allege an unconstitutional policy or custom

due to ratification.").)

Should he choose to file an amended pleading, Plaintiff must clearly articulate the specific theory of municipal liability he is pursuing, and the facts supporting that theory, rather than create duplicative, lengthy lists of purported failures without explaining how they apply to his claims.  Although the Court did not undertake an analysis of the first two elements of municipal liability, the Court reviewed Defendants' assertions as to the deficiency of those elements and agrees with much of their argument.  For example, the Court questions the sufficiency of Plaintiff's allegations concerning a pattern of multiple similar instances of misconduct—allegations from 2009 and 2011 are likely too remote in time, and allegations from May 28–30, 2020 (only two months before the incidents relevant to this case) are likely too close in time to demonstrate a well-settled custom or practice.  Plaintiff's AC lacks clear allegations regarding the specific inadequacies in training.  Similarly, the allegations with respect to the second element of causation are currently factually deficient.  The dismissal of Plaintiff's municipal liability claim is, of course, without prejudice, but the Court cautions Plaintiff that it will almost certainly not offer him a *third* bite at the apple.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. The Motion (ECF No. 34) is GRANTED IN PART AND DENIED IN PART as follows:

   a. Claim 1 (excessive force) is DISMISSED WITHOUT PREJUDICE;

   b. Claim 2 (denial of free speech) is DISMISSED WITHOUT PREJUDICE as duplicative of Claim 3 (retaliation);

    c.  All claims against Defendant John Doe are DISMISSED WITHOUT PREJUDICE;

    d.  The municipal liability claim is DISMISSED WITHOUT PREJUDICE;

    e.  The Motion is otherwise DENIED;

2.   Plaintiff is GRANTED LEAVE to file a Second Amended Complaint no later than **October 6, 2023**; and

3.   If Plaintiff files a Second Amended Complaint, Defendants' answer or other pleading in response is due by **October 27, 2023**.

Dated this 1st day of September, 2023.

BY THE COURT:

William J. Martínez
Senior United States District Judge