# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLORADO

**Civil Action No.** 22-cv-01927-WJM-STV

**MICHAEL SEXTON,**

**Plaintiff;**

**v.**

**LT. SEAN FARIS, lieutenant for the Denver Police Department, in his individual capacity;**

**JOHN DOE 1, Supervisory Officer for the Denver Police Department, in his individual capacity;**

**CITY AND COUNTY OF DENVER, a municipality;**

**Defendants,**

---

## THIRD AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff Michael Sexton, by and through her counsel, Kenneth Mark Burton of the Law Officer, hereby submits his Complaint and Jury Demand, and states as follows:

**INTRODUCTION**

1.    On or about of August 25, 2020, the Denver Police Department was forcibly removing homeless people from a homeless encampment. Upset by this disregard for our homeless community, a group of local citizens assembled into a small crowd to demonstrate their disdain for the Denver Police Department's treatment of our homeless community. Protesters openly

voiced their demand that the Denver Police stop their sweeps of the homeless encampments, expressing their disagreement with the police actions in Denver, Colorado.

2.      Denver Police set up a perimeter by holding up yellow tape to separate the protesters from the police operation. Michael Sexton, a journalist/protester, began filming the event, including interactions with Denver Police. with a cell phone and made some statements in protest of Denver Police's abusive conduct. Without provocation or legal basis, Denver Police Officer Lt. Faris walked up to Mr. Sexton, who had been lawfully standing behind a temporary perimeter established for lawful protests while holding his camera directly above his head with his hands clearly visible filming Denver Police's treatment of the homeless community, and intentionally recklessly sprayed him directly in the eyes with OC pepper spray, causing him extreme pain, temporary blindness, and an extended period of agony. This outrageous governmental conduct shocks the conscience and rises to the level of a Due Process violation as proscribed by the Fourteenth Amendment.

3.      Mr. Sexton was not arrested or charged with any alleged criminal wrongdoing. As such, no legal or reasonable basis for the use of any force against Mr. Sexton existed, as he was an innocent citizen exercising his civil right to protest Denver Police misconduct while carrying out his civil right to document injustices at the hands of law enforcement as a journalist. Faris' gross and abusive conduct was retaliatory and designed to chill Mr. Sexton's exercise of free speech, and effectively silenced Mr. Sexton.

**JURUSDICTION AND VENUE**

4.      This action arises under the Constitution and law of the United States and State of Colorado, including Article III, Section 1 of the United States Constitution and 42 U.S.C. § 1983.

5.      Jurisdiction is conferred upon this court pursuant to 28 U.S.C. § 1131 and 143, 42 U.S.C. § 1988, as amended by the Civil Rights Attorney Fee Award Act of 1976, and 28 U.S.C. §§ 1367(a) and 2201.

6.      Venue is proper in this District Court pursuant to 28 U.S.C. 1391 (b), as all the events giving rise to the claims occurred in the District of Colorado.

**PARTIES**

7.      Plaintiff Michael Sexton is a citizen of the United States and, at all times relevant to this suit, was a resident of the State of Colorado.

8.      Defendant Sean Faris ("Lt. Faris") is a citizen of the United States and resident of the State of Colorado. At all times relevant to this action, Lt. Faris was acting under the color of law in his capacity as a Lieutenant for the Denver Police Department located at: 1331 Cherokee Street, Denver, Colorado 80204. Lt. Faris is being sued in his individual and official capacity for his intentional chilling of Mr. Sexton's free speech through his unprovoked and sadistic attack against Mr. Sexton.

9.      Defendant John Doe ("Unknown Supervisor") is a citizen of the United States and resident of the State of Colorado. At all times relevant to this action, this Unknown Supervisor was acting under the color of law in his capacity as a Lieutenant or Captain of the Denver Police Department located at: 1331 Cherokee, Denver, Colorado. 80204. The Unknown Supervisor is being sued in his individual and official capacity for failing to intervene and prevent the unnecessary and unprovoked attack against Mr. Sexton with the intent of allowing Mr. Sexton to be subject to extreme violence without cause, despite his awareness of this abusive and aggressive behavior and having an opportunity and duty to prevent unnecessary violence against innocent citizens.

## FACTUAL ALLEGATIONS

### I. The Defendants Recklessly Attacked Mr. Sexton, an Innocent Citizen, Without Provocation or Legal Basis for the Use of Force in Direct Violation of His Due Process Right to Be Free from Excessive Force.

10.     On or about August 25, 2020, the Denver Police Department was forcibly removing homeless people from a homeless encampment in the Denver area. A small crowd of demonstrators gathered. The Police held up yellow tape to separate the protesters from the police operation.

11.     Michael Sexton was present and was exercising his First Amendment right to film the police, filming the event with his cell phone. Mr. Sexton is a journalist who has a YouTube channel called "Pikes Peak Accountability" where he publishes his videos for public viewing.

12.     Mr. Sexton, also, made statements with respect to police actions protesting the Denver police's abusive actions and in support of the homeless.

13.     As Mr. Sexton stood behind the correct side of the yellow tape of a designed area while filming the police's treatment of the homeless with his hands clearly in the air, Denver Police Officer Lt. Faris walked up to Mr. Sexton and sprayed him directly in the eyes with pepper spray, without provocation, or legal basis for the use of force, causing him pain, temporary blindness, and an extended period of agony.

14.     Mr. Sexton was never arrested or charged with any alleged criminal offense. Therefore, no legal or reasonable basis existed to use any force against Mr. Sexton, an innocent citizen that had been exercising his civil right to free speech. Faris' gross and abusive conduct was retaliatory and designed to chill Mr. Sexton's exercise of free speech, and effectively silenced Mr. Sexton.

15.    Mr. Faris' hate and disdain for Mr. Sexton was evidenced by his anger and facial expressions expressed immediately during this hostile interaction and is indicative of a malicious and sadistic intent to injure an innocent citizen, which is outrageous and shocking to the conscience as proscribed by the Fourteenth Amendment.

16.    The constitutionality of Mr. Sexton's documentation of a peaceful protest and his own individual protest of law enforcements misconduct was well established in this, and the surrounding, jurisdictions prior to his unconstitutional attack and this act of retaliation. See Irizarry v. Yehia, __F.3d__ (10th Cir. July 11, 2022); Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000). Therefore, Defendant Faris and the Unknown Supervisor knew to a degree of certainty that they were violating Mr. Sexton's constitutional rights guaranteed under the First and Fourteenth Amendments.

17.    Defendant Faris' and the Unknown Supervisor's acts and omissions, detailed herein, directly violated Mr. Sexton's First and Fourteenth Amendment rights, and were the legal and proximate result of the injuries of Plaintiff, including, but not limited to: pain and suffering, humiliation, physical injuries to Mr. Sexton's eyes and skin, and severe emotional distress which has damaged his quality of life.

**A. Defendants Retaliated Against Mr. Sexton for Exercising his Right to Free Speech.**

18.    Defendant Faris and the Unknown Supervisor knew very well that Mr. Sexton was a peaceful protestor, and that he had been lawfully participating in a public protest of law enforcement misconduct in furtherance of his First Amendment right to protest and was legally filming the police. In direct response to Mr. Sexton's exercise of his civil right to protest law enforcement misconduct and to film police. Defendant Faris and Unknown supervisor recklessly

and intentionally attacked Mr. Sexton, or allowed him to be attacked, with complete disregard for Mr. Sexton's First Amendment right to protest and to film the police. In fact, this abusive and retaliatory conduct was taken with the direct intention of violating Mr. Sexton's civil rights. But for Mr. Sexton's exercise of his right to protest, Defendant Faris and Unknown Supervisor would not have attacked him or allowed him to be attacked.

19.      Faris and Unknown Supervisor's malicious conduct and reckless failure to intervene occurred during Mr. Sexton's lawful exercise of his protected right to collect video footage and public protest. This adverse action is indicative of Faris' and Unknown Supervisor's retaliatory motive to chill Mr. Sexton's speech and documentation of this public protest.

20.      Defendant Faris and the Unknown Supervisor intentionally chilled Mr. Sexton's free speech in furtherance of the widespread and well accepted policies of the City and County of Denver and its agencies, namely the Denver Police Department, specifically a Cowboy culture and its derivative and pervasive attacks against citizens for contempt of cop often characterized as attitude arrests. This Cowboy culture within the Denver Police Department has existed for decades and is maintained off the books due to Denver's consistent effort to cover-up the misconduct of officers by falsifying reports or turning a blind eye to the use of excessive force, and persistent refusal to discipline officers for their deliberate violation of internal policies and Federal law enforcement standards.

21.      Defendant Faris and Unknown Supervisor, including the City and County of Denver are jointly liable for the severe injuries and substantial damages suffered by Plaintiff.

   **B. Unknown Supervisor Failed to Intervene When Officer Faris Began Charging At Mr. Sexton With the Intent to Harm Him.**

22.     The Unknown Supervisor was present during the protests against law enforcement, and witnessed Mr. Sexton peacefully assemble in the designated area as he videotaped the public protest. The Unknown Supervisor witnessed this public protest against Denver law enforcement, and despite his ability and authority to prevent or stop any unlawful attacks against the protestors, in furtherance of Denver's Cowboy culture, the well documented practice of attitude arrests for contempt of cop, and violent treatment of protestors, the Unknown Supervisor failed to intervene to prevent this retaliatory and unconstitutional attack against an innocent citizen, allowing Mr. Sexton to be sprayed in the eyes with a dangerous chemical. This sadistic conduct was taken with knowledge that Mr. Sexton would likely lose his vision without an opportunity to flush his eyes out due to the absence of a wash station or water source that was immediately available, which would increase the likelihood of injury and exacerbate his suffering.

23.     The Unknown Supervisor and Officer Faris refused to comply with Denver's policy and duty to provide Mr. Sexton medical attention and access to a flush station to remove the dangerous chemical that they sprayed in his eyes, which shows a malicious and sadistic intent to injure Mr. Sexton in direct violation of the Fourteenth Amendment right to be free from outrageous governmental conduct.

**II.     The City and County of Denver's Unconstitutional Policies Were the Driving Force Behind Mr. Sexton's Constitutional Violation.**

24.     The City and County of Denver, by and through, its Denver Police Department have long standing and widespread policies, customs, and/or practices that allowed the type of acts described herein, specifically Faris' abusive use of force against Mr. Sexton and the chilling of his free speech, which were necessarily and consciously approved by Mayor Hancock, Chief of Police

Pazen, and Safety Manager Robinson; which shows a deliberate choice to violate Mr. Sexton's

First, ~~Fourth,~~ and Fourteenth Amendment rights, a course of action taken in place of other more

appropriate alternatives.

25.     Official policy makers Mayor Hancock, Chief of Police Pazen, and Safety Manager

Robinson have final decision-making authority over the Denver Police Department and its staff,

and are responsible for the operations, practices, and the totality of conditions of the Denver Police

Department, Denver acts and fails to act through its official policy makers, whose acts and

omissions represent the policy, practices, and customs of the City and County of Denver.

26.     The City and County of Denver and the Denver Police Department and continue to have

numerous policies, practices, and/or customs that were the driving force behind and compelled the

violation of Mr. Sexton's civil rights. These policies and practices include, but are not limited to:

- a.  Cowboy culture and attitude arrests, designed to punish citizens for opposing Denver Police and don't provide adequate training and supervision regarding these issues;

- b.  Targeted attacks of protester by Denver Police and inadequate training and supervision regarding this issue;

- c.  Failure to give audible dispersal orders before the use of force and failure to supervise and train regarding this issue;

- d.  Indiscriminate and inappropriate use of chemical munitions such as tear gas, an inadequate training and supervision regarding this issue;

e.  Indiscriminate and inappropriate use of Pepper Ball, including as a crowd control/dispersal measure or on anyone disrupting traffic and without warning, and inadequate training and supervision regarding these issues;

f.  Inappropriate use of pepper spray and inadequate training for this issue;

g.  Failure to require officers to complete time use-of-force reports, which negatively impact officer accountability, and failure to train regarding this issue;

h.  Inadequate Body Worn Camera activation during crowd-control situations and failure to trainon this issue;

i.  Failure to discipline officers for the excessive use of force; and failure to train on these issues; and

j.  Dictating the rules of engagement for mutual assistance agencies from outside jurisdictions while simultaneously allowing agencies to follow their own policies.

See Epps v. City & County of Denver, 2022 U.S. Dist. LEXIS 35895 (Civil Action No. 1:20-cv01878-RBJ; 1:20-cv-01922-RBJ, [ECF Nos. 286-6] at¶¶6-142, [286-7]; see also supra, p. 3 n. 3], which is hereby incorporated by reference.

### A.  Denver's Historical and Widespread Practices of Violating Citizen's Civil Rights

27.  The Denver Police Department has a long history of targeting activists and protestors. The Denver Police are hostile to protesters, particularly those who call into question the policies of the City and County of Denver. There is a history of targeting and retaliation against protesters who

engage in speech activities in public places that amounts to a custom, policy, or practice of arresting, intimidating, and retaliating against protesters, particularly those protests that are critical of the City and County of Denver and its police department in public places in Denver. For decades, the Denver Police Department maintained a list of known activists and protesters with secret spy files on more than 3,200 people and 208 organizations. For most of these people and organizations, their only conduct was attending peaceful demonstrations. The Denver Police Department kept files on these activists and their organizations anyway. During this period of time, Denver Police Officers spied on certain protest leaders. Ultimately, the Denver Police agreed to end certain practices aimed at policing free speech activities. This, however, was not the end of the Denver Police Department's targeting of activists and Demonstrators and a few cases are mentioned below.

28.     On August 25, 2009, during the Democratic National Convention that was held in Denver, solid riot-equipped police stopped a peaceful protest march on 15th street in downtown Denver. A second group of riot police encircled the protesters and conducted a mass arrest of those protesters for marching without a permit. Without probable cause, the Denver Police arrested 96 peaceful protesters. The police charged the protesters with failing to observe a dispersal order, even though they later acknowledged that no such order was ever given. Nonetheless, the Denver Police continued to target these protesters, refusing to drop the charges. The protesters eventually prevailed on these charges and brought a civil rights action. Acks v. Denver, 09-CV-02197. Denver later agreed to a Class Action settlement for depriving these protesters of their constitutional rights.

29.     In the fall of 2011, the Denver Police targeted Occupy protesters, arresting dozens and deploying pepper balls in response to peaceful protests. Many of those demonstrators would continue to protest Denver Police violence and the treatment of the homeless for years to come. On August 14, 2014, Levi Frasier witnessed DPD officers punch an unarmed civilian, numerous times in the head, and tripped up a heavily pregnant woman, causing her to fall to the ground. Believing the officers were committing illegal acts of misconduct, Mr. Frasier video-recorded the officers with the tablet. Upon seeing Mr. Fraiser recording, DPD officers surrounded Mr. Frasier, threatened him with arrest, and demanded he turn over his video. Mr. Frasier refused, and the DPD officer seized his tablet from him and searched it illegally. Despite Denver's policy and training on the First Amendment, the officers nonetheless violated Mr. Fraiser's First Amendment right to gather and record information on matters of public concern.

30.     On July 5, 2018, Susan Greene, a journalist, was driving to the bank when she saw a black man handcuffed and naked on the sidewalk across from the State Capitol Building surrounded by DPD offices. Concerned as a public citizen and journalist by the questionable appearance of an African American man unclothed, nonthreatening, and in handcuffs, Ms. Greene parked her vehicle and began to take pictures on a public sidewalk where she was not obstructing police investigations. DPD officers told her to stop. The officers falsely accused Ms. Greene of violating the arrestee's HIPAA rights and of blocking the door to an ambulance. The officer then forcefully and painfully arrested Ms. Greene in retaliation for exercising her First Amendment right to photograph the police on a public sidewalk and handcuffed her for ten minutes before releasing her Ms. Greene was never charged with a crime. Ms. Greene's First Amendment retaliation and

Fourth Amendment excessive force claims against Denver and DPD officers were settled in August 2019 for $50,000 in addition to mandating First Amendment training for DPD officers.

31.     On September 23, 2018, Brian Loma and Mikel Whitney were on the 16th Street Mall distributing meals to the homeless with Ms. Sodaro. Shortly after Ms. Sodaro's arrest, Mr. Loma decried the treatment of homeless people ... "what we have [are] … laws that criminalize people who can't pay rent. They don't want your tourist dollars to recognize that we have problems in this city! The law says that if you're not paying money, you can't sit down." As he continued, Mr. Loma shouted "fuck the police!" He was immediately arrested for disturbing the peace. Mr. Loma and Mr. Whitney have filed 1983 civil rights claim which is currently ongoing. On September 23, 2018, Eric Brandt was in the Sixteenth Street Mall protesting the arrests of Ms. Sodaro, Mr. Loma, and Ms. Whitney. Mr. Brandt stood on a public sidewalk and shouted, "We want justice for

Caryn Sodaro! Caryn Sodaro is a political prisoner for free speech!"  Defendant Kitchens,

Defendant Cpl. Chavez, and three other officers were present and closely watching Mr.Brandt. Defendant Kitchens expressed his annoyance and stated loud enough for other people in the mall to hear, "unfortunately, we can't be offended, but if a private citizen is willing to sign a complaint, I'd be happy to arrest him." A woman standing nearby stated that she was offended and would sign a complaint. Defendant Kitchens and Cpl. Chavez then arrested Mr. Brandt in retaliation for his protected speech and cited him with disturbing the peace. Upon making the arrest, Defendant Cpl. Chavez radioed Defendant Guzman explaining that they had Mr. Brandt in custody and that a private citizen was willing to sign a complaint against him. Guzman explained that as long as

they had one signed complaint against him, then the arrest was valid. After spending two days in jail, Mr. Brandt was released, and his charge was dropped the next day, on September 27, 2018.

32.     On May 28, 2020, Abade Izarry, Gabriel Thorn, Amy Schnieder, Michael McDaniel, and other similarly situated Plaintiffs protested in Denver to express their outrage at the death of George Floyd and other acts of violence perpetrated by police officers against the African American community. During the demonstration, DPD officers violated the Plaintiff's First Amendment right to free speech and their Fourth Amendment right against excessive force by using pepper spray, pepper balls, rubber bullets, flashbang grenades, and tear gas to punish the Plaintiffs for demonstrating against police brutality. On June 5, 2020, Judge Brooke Jackson of the U.S. District Court of the District of Colorado found the Defendants in violation of the Plaintiffs' First and Fourth Amendment right and issued a temporary restraining order to enjoin Denver and DPD from employing chemical weapons or projectiles of any kind against persons engaging in peaceful protest.

33.     On or about August 25, 2020, the Denver Police were forcibly removing homeless people from a homeless encampment. A small crowd of demonstrators gathered and were expressing their disagreement with the police's actions. The Police held up yellow tape to separate the protesters from the police operation. Michael Sexton was present and was filming the event with a cell phone and may have made some statements protesting the police action. While Mr. Sexton was on the correct side of the yellow tape away from police operation, Denver Police officer Lt. Faris walked up to Mr. Sexton and sprayed him directly in the eyes with pepper spray causing him pain,

temporary blindness, and an extended period of agony. Mr. Sexton was never charged with committing any crime.

34.     Above, is a small selection of incidents where Denver Police targeted protesters, including Caryn Sodaro, because the way these protesters communicated their message, or simply because the Denver Police do not like the act of protesting and the messages of these protesters.

35.     Upon information and belief, the Denver Police have engaged in a concerted effort to target protesters, including Caryn Sodaro, such that the City and County of Denver's official policy makers Hancock, Pazen, and Robinson had constructive knowledge of these unconstitutional practices.

### 1. Denver's Widespread Customs and Practices

While many of these policies, customs, and/or practices were set off or instituted by the personal actions of Denver's official policy makers Hancock, Pazen, and Robinson, or by lower level staff, including Faris, that exercised final authority without supervision or review, many of these policies, customs, and/or practices were so widespread and commonly used by Denver Police officers that it is evidence that these customs or usages named above had force of law, including Denver's Cowboy culture and attitude arrests that set the stage for numerous officers to retaliate against and attack citizens when they feel disrespected. Thus, it is presumed that Hancock, Pazen, and Robinson had actual or constructive notice of these unconstitutional policies, customs, and/or practices.  Denver's policy makers failed to rectify these obvious needs for correction and obvious unconstitutional policies, customs, and/or practices, let alone implement policies that would adequately correct or compensate for these abusive practices as evidenced by

the following cases: Epps case (21-cv-1878-RBJ) [ECF 1], the Barbour Et al. case (21-cv-2477-RBJ) [ECF 1], and the Agwu Et al. case (21-cv-2478-RBJ) [ECF1], which are hereby incorporated by reference as fully set forth herein. Opinion, expert Natasha Powers, p.29, whose report is attached hereto as an exhibit and incorporated by reference.

36.    These decisive actions are indicative of a deliberate choice by Hancock, Pazen, and Robinson's to violate Mr. Sexton's civil rights and persons who come into contact with Denver law enforcement, a course of action taken from amongst other alternatives that were more appropriate and constitutional.

37.    The City and County of Denver, through the Denver Police Department, and its official policy makers has a custom and widespread practice of failing to comply with their own written policies with respect to, including, but not limited to: (1) First Amendment protests; (2) retaliation against citizens; (3) reporting official misconduct; (4) investigating the use of force by personnel against citizens; (5) use of force and/or pepper spray; (6) discharging and/or disciplining officers for misconduct; and (7) discharging and/or disciplining officers for concealing misconduct; therefore, representing a systemic failure to enforce written *policy*, largely motivated by Denver's efforts to escape civil liability. These unconstitutional policies, customs, and/or practices had the direct effect of violating the Plaintiff Mr. Sexton's civil rights, and were the driving force behind this First, Fourth, and Fourteenth Amendment violations.

### a. Denver Police's practice of inappropriate use of pepper spray and inadequate training thereon.

38.    Norman Stamper, a qualified law enforcement expert, who has diligently documented hundreds of independent police incidents that formed patterns of conduct that are indicative of a systemic and widespread practice of the Denver Police Department of violating citizens civil rights

during public protests and his hreports are ereby incorporated by reference. See Epps v. City and

Cnty of Denver, Case No. 20-CV-01878-RBJ [ECF # 286-6] ¶¶ 6-142; [286-7] ¶¶ 1-107. [1] In this

report, Mr. Stamper identifies "several disturbing patterns in the DPD use of force during large

scale protest, which are contrary to generally accepted police practices, standards, and training."

Id. At 39.        Specifically, DPD exhibited a widespread practice and custom of: (1) Failing to

give dispersal orders or audible dispersal orders prior to use of force, Id. at 19-55; (2) Inappropriate

use of pepper spray and inadequate training. See Epps v. City and City of Denver, Case No. 20-

CV-01878-RBJ

[ECF # 286-6] ¶¶ 90-97.

> Under the DPD Crowd Management Manuel, pepper spray is
> considered a chemical munition. (DPD Crowd Management
> Manual, p. 22…) The Manual states, "The use of a chemical agent
> for crowd control or riot control must be authorized by the Division
> or Unit Supervisor, except in the event of an emergency…." (DPD
>
> Crowd Management Manual, p. 23…) The Manual further states
> that chemical agent use may be appropriate in the following
> circumstances:
>
> - To prevent an injury to an officer or a third person.
> - To subdue a person who is threatening or attempting physical harm to himself or another.
> - Against subjects resisting arrest.
> - To quell rioting.
> - Against subjects interfering with an arrest.

---

[1] The Court may take judicial notice of Court records in other actions without converting this motion into a Rule 56 motion. See, e.g. Telllabs Inc. v. Makor Issues & Rights Ltd., 551 US. 308, 323 (2007); Gee Pacheco, 627 F.3d 1178, 1191 (10th Cir. 2010).

- Any situation with which the officer can clearly articulate the need for deployment.
- 

40.     There are numerous examples of DPD's inappropriate use of pepper spray during the GFP. The widespread nature of these examples— and the lack of discipline of DPD officers who engaged in this conduct—shows that the actual practice of DPD officers is quite different than what the DPD's Policy is in writing. It also shows that DPD officers were inappropriately and inadequately trained in the use of pepper spray. See Epps v. City and Cnty of Denver, Case No. 20-CV-01878-RBJ [ECF # 286-6] ¶¶ 90-91. Examples of these inappropriate use of pepper spray during protests, include but are not limited to:

   **i.  On May 28, 2020, at approximately 9:35, intersection of 14th and Lincoln.** 41.

A Denver Police Officer's body worn camera shows an officer deploying a pepper spray on individuals who were simply standing in the intersection when the officers decided it was time for them to move. Id. at 92. These individuals posed no threat to the officers, and they were given no warning prior to being pepper sprayed, which is very similar to the abusive use of mace by Faris against Mr. Sexton.

   **ii.  On May 28, 2020, at approximately 9:56 p.m., Capitol lawn east of Lincoln Street**

41. A Denver Police Officer deployed pepper spray on an individual pushing him into live traffic on Lincoln Street. This officer provided no warning that he was going to deploy pepper spray

on the individual. Epps v. City and Cnty of Denver, Case No. 20-CV-01878-RBJ [ECF # 286-6] ¶¶ 93. This is very similar to the abusive use of mace by Faris against Mr. Sexton, a widespread practice of DPD.

> **iii. On May 30, 2020, at approximately 5:46 p.m., intersection of Colfax and Lincoln.**

42. As Denver Police Officers started to move protesters south of Colfax, DPD deployed pepper spray on an individual even though he was not acting aggressively. Epps v. City and Cnty of Denver, Case No. 20-CV-01878-RBJ [ECF # 286-6] ¶¶ 94. This is abusive practice is very similar to the abusive use of mace by Faris against Mr. Sexton and is evidence of a systemic and widespread practice of DPD.

> **iv. On May 30, 2020, at approximately 6:54 p.m., intersection of Colfax and Lincoln.**

43. An Officer from the Denver Police Department deployed pepper spray on an individual without warning. The individual was slowly approaching the officers asking, "Which one of you'll shot me?" The officer told this individual to back up, and when he did not immediately comply, the officer deployed a significant amount of pepper spray directly into his face without warning. There was no attempt to de-escalate. Epps v. City and Cnty of Denver, Case No. 20-CV-01878RBJ [ECF # 286-6] ¶¶ 95. This is malicious practice is very similar to the abusive use of mace by Faris against Mr. Sexton and is indicative of a systemic and widespread practice of DPD, as well as a deficient training practice.

> **v. On May 30, 2020, at approximately 6:56 p.m., intersection of Colfax and Lincoln.**

44. Denver Police showered a group of protesters with pepper spray, Pepper Ball, and various other less-lethal munitions indiscriminately, who were tending to a man that had just been pepper sprayed, injuring each of them in direct response to an individual that had thrown a water bottle at the group of officers nearby. Epps v. City and Cnty of Denver, Case No. 20-CV-01878-RBJ [ECF # 286-6] ¶¶ 96. This abusive practice is an additional example of innocent citizens being subjected to excessive force by DPD inappropriate use of pepper spray in absence of a need or legal basis, quite like Faris' reckless conduct.

vi. **On May 30, 2020, at approximately 7:34 p.m., intersection of Colfax and Broadway.**

45. A Protester, Stanford Smith, was pepper sprayed in the face while he was walking peacefully in front of a line of officers with his hands raised in the air. Epps v. City and Cnty of Denver, Case No. 20-CV-01878-RBJ [ECF # 286-6] ¶¶ 97. This existence of a systemic inappropriate use of pepper spray and inadequate training is, now, patently clear.

vii. **On May 30, 2020, at approximately 8:20 p.m., vicinity of 14th and Broadway.**

46. Denver Police Officers were marching in a line and moving protesters as they moved, deploying pepper spray on individuals without warning when they were not moving fast enough.  The body worn camera shows an officer telling a woman to "move out," and "you're making no point, just go," "just keep going," and "it's not worth it." When the woman did not back up fast enough, a DPD officer pepper sprayed her without warning. Epps v. City and Cnty of Denver, Case No. 20-CV-01878-RBJ [ECF # 286-6] ¶¶ 98. This reckless and widespread

practice of inappropriate use of pepper spray and inadequate training thereon is actionable under the rubric of Monell v. Dept. of Social Services, 436 U.S. 658, 691 & n. 54 (1978).

**b. DPD exhibited a widespread practice and custom of failing to give dispersal orders or audible dispersal orders prior to use of force.**

47. It is generally accepted police practice to provide dispersal orders, warnings, or announcements before use of chemical munitions or other less-lethal weapons on individuals. (See, OIM Report, p. 25 (citing IACP Law Enforcement Policy Center, *Crowd Management Model Policy,* IV.F.3).) As explained further below, the evidence shows that such orders, warnings, or announcements were rarely provided. In fact, very few videos of the police interactions during the GFP contain any evidence or announcements or dispersal orders given by DPD prior to use of less lethal weapons on protestors. That no warnings are audible reveals that no warnings were given or that only inaudible warnings were given. Statements from Mr. Sexton and other protesters shows that orders, warnings, and announcements were not given by Denver Police. There was also little documentation of dispersal orders given prior to use of less-lethal weapons. The failure to give audible dispersal orders, warnings, and/or announcements prior to the use of less-lethal weapons on protesters is contrary to generally accepted police practices, standards, and training. The DPD's policy and practice caused in significant part the violation of the constitutional rights of the protesters, including Mr. Sexton. It is also contrary to the DPD Crowd Management Manual. Protesters must be provided an opportunity to comply with police orders or police direction *before* force is used on them. This is especially true for the use of chemical munitions such as pepper spray, which affects peaceful and non-peaceful protesters alike. A few specific examples are discussed below:

### i. May 28, 2020, 8:30 p.m., Colfax and Washington

48. At approximately 8:30 p.m. on May 28, 2020, a group of protesters marched toward and gathered at the district 6 police station at Colfax and Washington.  (Den 3850.)  By 8:29 p.m., the bulk of the crowd was on the south side of the Colfax and Washington intersection.  The crowd appears to be impeding traffic flow, but otherwise appears mostly peaceful.

49. At about this time, Commander Phelan (radio call sign "Adam 9") explained to his team that he wants to use "less-lethal Pepper Ball" or "launch some gas" to move the protesters away from the intersection.  (DPD Tac 6 Dispatch Audio Files Den 5143 at 2020-05-28_20.28.18_Ch33, 2020-05-28_20.28.49_Ch33; AirOne video May 28 (DEN 3840) at 8:28:18 p.m. and 8:28:52 p.m. MT.  There is no discussion on the radio of a plan for providing warnings to the crowd before deployment of gas.   There is no other evidence of any announcements or dispersal orders given before the deployment of less-lethal munitions. And an unlawful assembly was not declared before protesters were dispersed through the use of force. (Canino Deposition, pp. 37-38.)  Officers deployed gas and Pepper Balls at protesters.

50. At 8:33 p.m., DPD formed a skirmish line just north of the intersection and began deploying large amounts of Pepper Ball into the intersection, and they advanced the skirmish line south to the intersection.  At this time on the radio, you can hear Commander Phelan tell his team that he wants to move the protesters southbound on Washington and "just disrupt them there." (DPD Tac 6 Dispatch Audio Files DEN 5143 at 2020-05-28_20.43.12_Ch33; AirOne video May 28 (DEN 3840) at 8:43:18 p.m. MT).

51. At about 8:36 p.m., DPD officers on the ground advanced a skirmish line south through the intersection, deploying Pepper Ball along the way, as seen in Colfax & Washington HALO

05.28.2020. Most of the protesters retreated further south. Epps v. City and Cnty of Denver, Case No. 20-CV-01878-RBJ [ECF # 286-6] ¶¶ 20-24.

    a. **May 28, 2020, 9:30-10:00 p.m., Lincoln Colfax.**

52. A crowd of protesters gathered around the intersection of Lincoln and Colfax on the west side of the capitol. DPD officers had formed an east-west line facing north on Lincoln. HALO Video 1450 Lincoln.

53. The crowd of protesters appear generally peaceful, and there is live traffic on Colfax behind the protesters. On the radio, at around 9:47 p.m., Commander Phelan can be heard on the radio instructing officers "As soon as you get there, launch" and "Actually, throw a smoke first then some chemical right after." DPD Tac 6 Dispatch Audio Files, at 2020-05-28_21.47.14_Ch33. At 9:48 p.m. an officer responds on the radio saying, "We are code six with 'em and we're putting some gas in the crowd."  (DPD Tac 6 Dispatch Audio Files at 2020-05-28_21.48.13_Ch33). At 9:48 p.m., several DPD officers in green fatigues exit a vehicle behind the line of DPD officers and deploy 7-8 canisters of what appears to be tear gas into the crowd of protesters, causing them to retreat north into the live traffic on Colfax.

54. DPD's use of less-lethal weapons at this location and time was contrary to generally accepted policies practices, standards, and training because there were no audible warnings given and no isolated non-peaceful protesters. For instance, IACP Concepts and Issues Paper on Crowd Management provides, "The crowd should be warned prior to CS deployment and provided with avenues of egress." It was also an egregious disregard for the safety of the protesters to push them into live traffic on Colfax using tear gas. (CSP video, 05282020 v88 at 9:47:46 p.m. MT). Epps v. City and Cnty of Denver, Case No. 20-CV-01878-RBJ [ECF # 286-6] ¶¶ 43-47.

a. **May 29, 2020, 9:19 p.m., Lincoln and 13ᵗʰ.**

On May 29, 2020, at 9:19 p.m., DPD body warn camera shows officers casually throwing a tear gas canister at the motorist and yelling "woohoo" afterward. This sadistic and reckless conduct is further evidence that DPD's Cowboy Culture is alive and well, violating citizen civil rights arbitrarily. Epps v. City and Cnty of Denver, Case No. 20-CV-01878-RBJ [ECF # 286-6] ¶ 47.

b. **May 30, 2020, 5:30-8:00 p.m., Lincoln and Colfax.**

55. On May 30, 2020, between approximately 5:30-6:00 p.m., there was many protesters at Civic Center station, at the intersection of Broadway and Colfax.

56. At about 5:43 p.m., a Body Worn Camera shows that DPD attempted to make announcements. In Officer Carmody's Body Worn Camera at 5:44:46 p.m. MT, an officer tells Officer Carmody that "announcements will be made and then they were going to throw gas. Moments after that, I could vaguely hear an announcement "get out of the street," and "go back to the park," "or you will be arrested," but the scene is very loud with the protesters chanting. However, the is no evidence that the officers made any attempt to make sure the protesters could hear the announcements.

57. At approximately 5:45-5:47 p.m., protesters were pushed south of the intersection by the DPD officers using less-lethal and chemical munitions. This use of force was completely inappropriate and contrary to the generally accepted police practice. It is fundamental that if officers are going to use force to disperse protesters, they need to provide warning of such. In this instance, DPD did not. Not only were the announcements apparently inaudible to the protester, but protesters were not warned that chemical agents would be used. Moreover, and

even more egregious. DPD was pushing protesters into a busy street (Colfax) without doing anything to ensure the safety of the protesters (or drivers), and, there did not appear to be adequate reason in the first place for dispersing the protesters. For instance, the video does not show anyone throwing anything at the officers before the less lethal munitions were used on the protesters. Protesters have a First Amendment right to demonstrate on the streets, sidewalk, and public parks. Epps v. City and Cnty of Denver, Case No. 20-CV-01878-RBJ [ECF # 286-6] ¶¶ 20-24.

**2.**     **Denver's Failure to Train, Supervise, and/or discipline**

58.     In addition, the City and County of Denver, through its official policy makers—Hancock, Pazen, and Robinson, failed to properly train, supervise, and/or discipline its subordinates Faris, Unknown Supervisor, and others to: (1) prevent the unnecessary use of force against citizens; (2) prevent Denver's widespread Cowboy Culture and attitude arrests; (3) prevent attacks against citizens who protest police misconduct; (4) prevent the cover-up of official misconduct; and (5) ensure that law enforcement are discharged or properly disciplined for the intentional misconduct. Alternatively, if Denver's training, supervision, procedures, or guidelines did exist, they are, and were, grossly inadequate so to ensure the above stated deficiencies were corrected or avoided. Opinion, expert Natasha Powers, pp. 28-29 (use of pepper spray and lack of training.)

59.     Hancock, Pazen, and Robinson, as superior officers, are responsible for the training supervision and discipline of personnel at the Denver Police Department. And considering this duty and responsibility of these superior officers, who exercise authority over their appropriate agencies, the clear lack of proper training and supervision with respect to the above stated

deficiencies, and likelihood that this inadequate training and supervision would result in the transgression of persons constitutional rights such as those described herein, the fact that these superior officers fail to train and properly supervise, amounts to deliberate indifference to the constitutional rights of persons with whom the Denver Police Department and its personnel come into contact with, including Sexton. Opinion, expert Natasha Powers, pp. 12, 27 (DPD training reflects an unconstitutional practice of using force and cruelty to innocent citizens).

60.    These above stated policies, customs, and practices, and the lack thereof, led to Mr. Sexton's constitutional right being violated, as described herein, and if these deficiencies and lack of regulations persist, including the systemic failure to enforce written policies with respect to the abuses described above, the Plaintiff Mr. Sexton and citizens in Colorado will remain in constant peril of being physically abused and retaliated against for exercising the right to free speech. Therefore, it is within the interest of justice that the Federal Court enjoin the defendants from perpetuating its Cowboy culture and attitude arrests custom and practice, amongst other pervasive unconstitutional practices that have and continue to violate citizen's civil rights.

**3.    Lieutenant Faris' acts and omissions as the incident commander set off official policy for the city and county of Denver.**

61.    Lieutenant Faris acted as an incident commander during the relevant protest and was afforded official policy making authority by the chief of police Pazen. The city and county of Denver and its Denver Police Department acts and fails through its official policy makers including chief Pazen and incident Commander Faris. Incident commander Faris was a final decision maker with respect to the use and appointment of chemical munitions during the September 25th protest. As an official policy maker with final decision-making authority, Faris made the decision to use

extreme force and cruelty towards an innocent citizen in absence of any threat to life or security or legal basis for use of force. Opinion, Expert Natasha Powers. Page 32.

62.     Faris intentionally used chemical munitions against Mr. Sexton in a manner of contrary to DPD-s formal policy and manuals, which amounts to extreme cruelty and extreme force contrary to the fourteenth amendment. This malicious and sadistic use of force was obviously indifferent to Mr. Sexton's constitutional rights and well-being and rises to the degree of outrageous governmental misconduct. Moreover, this unconstitutional use of force set off an unconstitutional policy for the Denver Police Department and city and county of Denver.

63.     Faris intentionally refused to treat Mr. Sexton for OC exposure and properly decontaminate Mr. Sexton to prevent injury. This obvious failure to decontaminate resulted in serious injury including blindness and amounts to extreme cruelty contrary to DPD policy and procedural manuals and contrary to good law enforcement practices. This sadistic and malicious conduct was indifferent to Mr. Sexton's plight and had the direct effect of violation his fourteenth amendment right to be free from excessive force. Further, this intentional violation of Mr. Sexton's civil rights intentionally set off a unconstitutional policy of failure to decontaminate which was the driving force behind Mr. Sexton's deprivation of his fourteenth amendment rights and physical injuries.

64.     Faris' retaliatory conduct in response to Mr. Sextons exercise of his first amendment right to protest actively established unconstitutional policy of retaliation against protestors for the city and county of Denver and Denver Police Department. This unconstitutional practice of retaliating against innocent protesters was the driving force behind the deprivation of Mr. Sexton's first amendment right to be free from retaliation, and directly caused his injury, including blindness and severe pain.

65.     Faris' decisive and intentional conduct, including use of force, retaliation, and failure to decontaminate, were taken with the intent, and understanding to violate Mr. Sexton's first and fourteenth amendment rights. This abusive and reckless conduct was further ratified and or authorized by chief police Pazen with the intent and understanding that this unconstitutional conduct would violate citizen civil rights and continue to foster a culture of violating citizen civil rights. These official policy makers' actions and omissions represent a deliberate intent to violate citizens civil rights and were deliberately indifferent to Mr. Sexton's first and fourteenth amendment rights.

**FIRST CLAIM FOR RELIEF AND SUPPORTING FACTUAL ALLEGATIONS**

**42  U.S.C. § 1983—Excessive Force—Fourteenth Amendment Violation**

66.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

67.     At all times relevant to this action, the Defendants were acting under the color of state law.

68.     Defendant Faris deprived Mr. Sexton of his Fourteenth Amendment protection from excessive use of force that amounts to governmental action which is arbitrary or "shocks the conscience" in violation of the Due Process clause, when Denver Police Officer Faris attacked Mr. Sexton without provocation or need for the use of force as detailed in paragraphs 9-18, which was unreasonable and outrageous governmental conduct that shocks the conscience under County of Sacramento v. Lewis, 523 U.S. 833, 843-44(1998).

69.     By way of illustration, not limitation, Defendants violated Mr. Sexton's right to be free from excessive force by: (1) Faris recklessly, willfully, maliciously, and intentionally attacking

Mr. Sexton without provocation by spraying him in the face with pepper spray; and (2) Unknown Supervisor failed to intervene despite being aware of Faris' malevolent intent to harm protesters.

70.     Faris' use of force against Mr. Sexton was objectively unreasonable in light of the facts and circumstances confronting him, notwithstanding his underlying intent or motivation. Morris v. Noe, 672 F.3d 1185, 1195 (10th Cir. 2012).

71.     For instance, a careful review of the facts and circumstances of this particular case, including: [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight, as set forth in Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct 1865, 104 L.Ed 2d 443 (1989), evinces that Faris' conduct was grossly excessive. There was no crime committed by Mr. Sexton, nor did he pose a threat when he was exercising his constitutional right to free speech.

72.     Defendant Farris' motive to injure Mr. Sexton was inspired by malice and excessive zeal to punish an innocent citizen and was an abuse of police authority that is shocking to the conscience. Mr. Farris was standing behind a secure barrier with the assistance of numerous officers in absence if any threat of harm and identified Mr. Sexton an innocent citizen and directly charged towards him and sprayed him in the eyes and face with a chemical agent with the intent and understanding of causing injury and severe pain.

73.     During the subject protest, Farris stood behind the police barriers where he was able to view and identify law violators and serious threats, but when he identified Mr. Sexton as a innocent

citizen and an absence of any threat, Farris became enraged and intentionally charged at Mr. Sexton with his pepper spray pointed directly at Mr. Sexton, discharging this chemical agent unnecessarily. Farris acted in absence of any intent to restore order or arrest Mr. Sexton, and purely with an intent to cause injury to Mr. Sexton out of malice.

74.     Farris' angry facial expressions and aggressive behavior towards Mr. Sexton expressed an excessive and extreme cruelty towards Mr. Sexton; Therefore, evincing a sadistic and malicious intent to injure an innocent citizen. The citizens who witnessed this conduct including expert Natasha Powers, were outraged by this extreme conduct and excessive cruelty, and any reasonable person exposed to such cruelty would have been shocked.

75.     Farris' reckless sadistic use of force was intended to cause an innocent citizen serious harm and pain and suffering, in fact causing Mr. Sexton serious injuries including temporary blindness and extreme pain for a prolonged period.

76.     The risk of harm to Mr. Sexton due to the use of a chemical agent directly in his eyes was obvious to Farris. Even then, Farris knew that directly spraying a chemical agent in the eyes of Mr. Sexton without proper decontamination would cause him serious injury. Still, Farris directly sprayed Mr. Sexton in the eyes and intentionally refused to offer decontamination with the intent of causing injury to an innocent citizen, which is shocking to the conscience and deliberately indifferent to Mr. Sexton's situation. Indeed, Farris acted with extreme and excessive cruelty toward Mr. Sexton.

77.     In addition, Farris knew that Mr. Sexton was far from a wash station or location where he could decontaminate, and that the result of his unnecessary use of chemical agents against Mr. Sexton would cause a prolonged period of suffering, including blindness and other injuries. Farris

ignored this unnecessary risk of serious injury to Mr. Sexton and with the sadistic intent to injure him, sprayed him directly in the eyes. This refusal to provide Mr. Sexton medical treatment or assistance represents Mr. Farris' malice and desire to aggravate Mr. Sextons injuries. In sum, Farris' refusal to provide medical assistance and "refusal without cause to alleviate [a weapon's] harmful effects constitutes excessive force." LaLonde v. County of Riverside 204 F.3d 947, 961 (9th Cir. 2000).

78.     Accordingly, the dynamics of this unnecessary use of a chemical agent on a innocent citizen, in absence of a threat of harm, an obvious resultant—serious injury, is such that it would cause any reasonable citizen to cry "outrageous." This outrageous police conduct was sadistic and shocking to the conscience, and had the direct effect of violating Mr. Sexton's 14th Amendment right to be free from excessive force. [1]

79.     The defendant's intentional and malicious use of excessive force against Plaintiff and intentional refusal to intervene to protect Mr. Sexton's rights directly and proximately caused his injuries.  As a direct and proximate result of the acts, omissions and violations alleged above, Plaintiff has suffered damages, injuries, pain and suffering, inconvenience, emotional distress, impairment of quality of life, past and further economic loses, reasonable and necessary medical, hospital, and other expenses, amongst other injuries.

80.     The existence of a policy and practice is evidenced by expert witness reports identifying numerous DPD policies and customs.  Epps v. City & County of Denver, 2022 U.S. Dist. LEXIS

---

[1] Whether the use of pepper spray was malicious or sadistic is a question for the jury. See e.g. Johnson v. Blaucket or 53 F.3d 1108, 1112-13 (8th Cir. 2006).

35895 (Civil Action No. 1:20-cv-01878-RBJ; 1:20-cv-01922-RBJ, [ECF Nos. 286-6] at¶¶6-142, [286-7]; see also supra, p. 3 n. 3], which is hereby incorporated by reference.

81.     Defendant Faris and Unknown Supervisor were, upon belief, following DPD policies, including their attitude arrests and harassment of protestors in furtherance of DPD's widespread practices when Faris attacked the Plaintiff. W

82.     Faris and Unknown Supervisor's compliance with DPD policies led to violations of Plaintiff's Fourteenth Amendment rights; as such, a reasonable jury could find a causal connection between the policies and the violations.

83.     Plaintiff Mr. Sexton has a constitutionally protected right to be free from excessive force under the Fourteenth Amendment that was clearly established before these abuses took place. Based on this premise, each of the Defendants had notice that they were violating Mr. Sexton's civil rights when they used excessive force against him without legal basis.

84.     Any reasonable law enforcement officer knew or should have known at the time of the complained conduct, that Mr. Sexton had a right to be free from excessive force, and that punishing a citizen using force, without cause, violated the Fourteenth Amendment, as well as Federal law. Thus, the Defendants were on notice that their conduct violated Mr. Sexton's civil rights and Federal law based on the clearly established nature of the law.

85.     The Unknown Supervisor knowingly, intentionally, willfully, and wantonly ratified Defendant Faris' use of excessive and unreasonable force against Mr. Sexton as detailed above, with the intent and understanding to violate his civil rights.  This abusive and reckless conduct was taken with a reckless intent and complete disregard for Mr. Sexton's constitutional rights to be free from unreasonable and excessive force.  This supervisory action was taken with the mind set and

understanding to violate Mr. Sexton's civil rights with knowledge that any inaction or proper guidance, Mr. Faris would injure Mr. Sexton and other citizens; thereby, depriving Mr. Sexton of his First and Fourteenth Amendment rights.

86.     The Defendant's actions, as described above, were undertaken intentionally, maliciously, and sadistically to cause harm and injury to Mr. Sexton and in reckless disregard for Mr. Sexton's constitutionally protected right to be free from excessive and unreasonable force.

87.     As a direct and proximate result of the acts, omissions, and constitutional violations alleged above, Plaintiff Mr. Sexton has suffered damages, injuries, pain and suffering, inconvenience, emotional distress, impairment of quality of life, humiliation, amongst other injuries.

## SECOND CLAIM FOR RELIEF AND SUPPORTING FACTUAL ALLEGATIONS

### 42 .S.C.§ 1983 – Denial of Free Speech – First Amendment Violation

88.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

89.     Defendants were acting under the color of state law in their actions and inactions which occurred of all times relevant to this action.

90.     Plaintiff has a protected First Amendment rights to express his viewpoint and support such by attending peaceful protests to redress grievances against racial injustice and police misconduct/brutality, to assemble and associate with other peaceful protesters, and/or collect

meaningful video footage and document such public protests and the public response by the police to such protests.

91.     Mr. Sexton's protests and videotaping of the protest in Downtown Denver were protected activities under the First Amendment.

92.     Recognizing that the Defendant's content-based speech restrictions "must satisfy strict scrutiny", and that this restriction must be "narrowly tailored to serve a compelling government interest."  The Defendant's intentional chilling of Mr. Sexton's free speech by spraying him in the eyes with pepper spray is the sort or narrow tailoring in the strict-scrutiny context that is proscribed by the First Amendment.

93.     The protest-targeted attacks by the Denver Police are content-based because it applied only to those participating in what the DPD referred to as advocates for Homeless protesters.  See *Golan v. Gonzales*, 501 F.3d 1179, 1196 (10th Cir. 2007) ("Content-based restrictions to speech are those which suppress, disadvantage, or impose differential burdens upon speech because of its content.").

94.     The protest-targeted attacks by the Denver Police were not "narrowly tailored", because these restrictions on speech were not the least restricted means of achieving the governments compelling objective.  Pointedly, Denver Police Department and supporting agencies could have achieved the same compelling interests in a way that imposed a less onerous burden on speech.  Upon belief, the government will attempt to identify disturbances occurring Downtown that involved substantial destruction of property and endangered the public safety to justify its sadistic

and abusive conduct; this, however, does not change the dynamic, because Mr. Sexton was peacefully protesting in a designated area behind the restrictive tape.

95.     Plaintiff Mr. Sexton has a constitutionally protected right to free speech and right to collect meaningful video footage under the First and Fourteenth Amendments that was clearly established before the subject incident and abuses alleged herein. Based on this premise, each of the Defendants had notice that they were violating Mr. Sexton's civil rights when they retaliated against him for exercising his right to free speech and freedom of the press.

96.     Any reasonable law enforcement officer knew or should have known at the time of the complained of conduct, that Mr. Sexton was entitled to exerciser his freer speech, and that preventing a citizen for exercising his free speech violated the First and Fourteenth Amendment, as well as Federal law.  Thus, the Defendants were on notice that their conduct violated Mr. Sexton's civil rights and Federal law, based on the clearly established nature of the law.

97.     The Unknown Supervisor knowingly, intentionally, willfully, and wantonly ratified Defendant Faris malicious conduct and chilling of free speech, as detailed above, with the intent and understanding to prevent Mr.  Sexton and others from protesting DPD's reckless conduct.

98.     This abusive and reckless conduct was taken with a reckless intent and complete disregard for Mr. Sexton's constitutional right to free speech, and more was taken with the mind set and understanding to violate Mr. Sexton's civil rights; thereby depriving him of his First and Fourteenth Amendment rights.

99.     The Defendant's actions, as described above, were undertaken intentionally, maliciously, and sadistically to cause harm and injury to Mr. Sexton, and in reckless disregard for Mr. Sexton's constitutionally protected right to free speech.

100.    The deprivation of Mr. Sexton's constitutional rights, and described herein, occurred because of Denver's execution of its policies, customs, and practices; and therefore, is made actionable pursuant to 42 U.S.C. 1983 under the rationale of Monell v. Dep't of Social Serv., 436 U.S. 658 (1978).

101.    The acts and omissions of Hancock, Pazen, and Robinson, as official policymakers for Denver and its agencies, constitutes and established the unconstitutional policies, customs, and practices that were followed by Faris and Unknown Supervisor, that had the direct effect of subjecting Mr. Sexton to a deprivation of his free speech rights and freedom of press rights prescribed by the First Amendment.

102.    These unconstitutional policies, customs, and practices, including but not limited to: (1) fostering a cowboy culture that encourages attitude arrests; (2) retaliating against citizens for protesting police misconduct; (3) failing to properly train officers to prevent unnecessary and retaliatory uses of force, as detailed in paragraphs 18-26, and were the driving force behind Mr. Sexton's civil rights violations.

103.    As a direct and proximate result of the acts, omissions, and constitutional violations alleged above, Plaintiff Mr. Sexton has suffered damages, injuries, pain and suffering, inconvenience, emotional distress, impairment of quality of life, humiliation, amongst other injuries.

## THIRD CLAIM FOR RELIEF AND SUPPORTING FACTUAL ALLEGATIONS

### 42  U.S.C. § 1983—Retaliation—First Amendment Violation

104.    Plaintiff hereby incorporates all other paragraphs of this complaint as if fully set forth herein.

105.    At all times relevant to this action, the Defendants were acting under the color of state law.

106.    Plaintiff Mr. Sexton is an innocent citizen that lawfully exercised his right to free speech under the First Amendment, by videotaping the abusive treatment of Denver citizens by the Denver Police Department and verbally calling out this misconduct in an effort to prevent further violations.  Mr. Sexton's free speech was met with violent force designed to chill his protest.  More specifically, Faris aggressively sprayed Mr. Sexton with mace in the eye and face to cause him serious harm.  This malicious and humiliating conduct was, also, designed to deter Mr. Sexton speaking out against Denver Police and filming this abusive conduct for publication.

107.    The Defendant Faris and Unknown Supervisor's actions caused Mr. Sexton extreme pain and temporary loss of his sight, an injury that would have chilled a person of ordinary firmness from protesting and collecting video footage for the public protests._Physical and verbal intimidation has been found sufficient to chill speech. Van Deelon v. Johnson, 497 F.3d 1151, 1157 (10th Cir. 2007)

108.    But for Mr. Sexton's protest and videotaping of DPD's egregious conduct against other citizens-exercising his rights to free speech, the Defendant Mr. Faris would not have subjected Mr.

Sexton to this retaliation and humiliation.  Thus, the Defendant's retaliatory conduct was purely motivated by Mr. Sexton's exercise of his rights to reasonable accommodations.

109.    Any reasonable law enforcement officer knew or should have known at the time of the complained of conduct, that Mr. Sexton was entitled to exercise his free speech and be free from retaliation, and that punishing a citizen for exercising his free speech violated the First and Fourteenth Amendments, as well as Federal law.  Thus, the Defendants were on notice that their conduct violated Mr. Sexton's civil rights and Federal law, based on the clearly established nature of the law.

110.    The Unknown Supervisor knowingly, intentionally, willfully, and wantonly ratified Defendant Faris retaliatory and malicious conduct, as detailed above, with the intent and understanding to punish Mr. Sexton for protesting DPD's reckless conduct.  This abusive and reckless retaliatory conduct was taken with an intent and deliberate disregard for Mr. Sexton's constitutional right to be free from retaliation, and more was taken with the mind set and understanding to violate Mr. Sexton's civil rights; thereby, depriving him of his First and Fourteenth Amendment rights.

111.    The Defendant's actions, as described above, were undertaken intentionally, maliciously, and sadistically to cause harm and injury to Mr. Sexton, and in reckless disregard for Mr. Sexton's constitutionally protected right to be free from retaliation.

112.    The deprivation of Mr. Sexton's constitutional rights, and described herein, occurred because of Denver's execution of its policies, customs, and practices; and therefore, is made

actionable pursuant to 42 U.S.C.   1983 under the rationale of *Monell v. Dep't of Social Serv*., 436 U.S. 658 (1978).

113.    The acts and omissions of Hancock, Pazen, and Robinson, as official policymakers for Denver and its agencies, constitutes and established the unconstitutional policies, customs, and practices that were followed by Faris and Unknown Supervisor, that had the direct effect of subjecting Mr. Sexton to a deprivation of his constitutional right to be free from retaliation as proscribed by the Fourth Amendment.

114.    These unconstitutional policies, customs, and practices, including but not limited to:  (1) fostering a cowboy culture that encourages attitude arrests; (2) retaliating against citizens for protesting police misconduct; (3) failing to properly train officers to prevent unnecessary and retaliatory uses of force, as detailed in paragraph 18-26, and were the driving force behind Mr. Sexton's civil rights violations.

115.    As a direct and proximate result of the acts, omissions, and constitutional violations alleged above, Plaintiff Mr. Sexton has suffered damages, injuries, pain and suffering, inconvenience, emotional distress, impairment of quality of life, humiliation, amongst other injuries.

## PRAYER FOR RELIEF

116.        Plaintiff prays that this Court enter judgment for the Plaintiff and against each of the Defendants, jointly and severally, and grant:

   a.    Appropriate relief at law and equity;

b.   Economic losses on all claims as allowed by law;

c.   Compensatory and consequential damages, including damages for personal injuries, including, but not limited to:  Damages for emotion distress, humiliation, loss of enjoyment of life and income, and other pain and suffering on all claims by law in the amount to be determined at trial;

d.   Punitive damages on all claims allowed by law and in an amount to be determined at trial;

e.   Attorney's fees and costs associated with this action, including expert witness fees, on all claims allowed by law;

f.   Pre-judgment and post-judgment interest at the appropriate lawful rate; and

g.   Any further relief that this court deems just and proper, and any other relief as allowed by law.

**Plaintiff Respectfully Requests a Jury on all Issues so Triable.**

Dated this 6th day of October 2023

s/Kenneth Mark Burton
_____
Kenneth Mark Burton
ATTORNEY AT LAW

The Law Offices of Mark Burton, PC
1175 Osage Street, Suite 210
Denver CO, 80204
Phone 303.517-1187
Fax 303.379-3922
Email:  burtonslaw2000@yahoo.com

### CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of October 2023, I served a true and correct copy of the foregoing: THIRD AMENDED COMPLAINT AND JURY DEMAND With the Clerk of the Court by CM/ECF system and to all attorneys of record.

/s Kenneth Mark Burton