IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 22-cv-1927-WJM-CYC

MICHAEL SEXTON,

    Plaintiff,

v.

SEAN FARIS, Lieutenant for the Denver Police Department, in his individual capacity,
JOHN DOE 1, Supervisory Officer for the Denver Police Department, in his individual capacity, and
CITY AND COUNTY OF DENVER, a municipality,

    Defendants.

---

### ORDER GRANTING DEFENDANT LT. SEAN FARIS'S MOTION FOR SUMMARY JUDGMENT

---

Before the Court is Defendant Lieutenant Sean Faris's ("Lt. Faris") Motion for Summary Judgment ("Motion"). (ECF No. 86.) Plaintiff Michael Sexton filed a response (ECF No. 90), to which Lt. Faris filed a reply (ECF No. 93).

For the following reasons, the Motion is granted.

### I. PRELIMINARY MATTERS

Before summarizing the pertinent factual background, the Court addresses two evidentiary issues raised in Lt. Faris's reply.

First, Lt. Faris argues that Sexton cannot rely on the unsworn expert report of Natasha Powers to dispute certain facts set forth in Movant's Statement of Material Facts and that those facts should accordingly be deemed admitted. (ECF No. 93 at 2; ECF No. 90 at 3 ¶¶ 14, 19; *id.* at 5 ¶ 36.)  This Court has routinely rejected the

argument that unsworn expert reports cannot create a genuine issue of material fact sufficient to defeat summary judgment.  *See Fabian v. State Farm Mut. Auto. Ins. Co.,* 2023 WL 5179113, at *4 (D. Colo. Aug. 11, 2023); *Silverman v. Greenfield,* 2019 WL 409340, at *11 (D. Colo. Jan. 31, 2019); *Olivero v. Trek Bicycle Corp.,* 291 F. Supp. 3d 1209, 1214–15 (D. Colo. 2017); *Sanchez v. Hartley,* 299 F. Supp. 3d 1166, 1182 n.11 (D. Colo. 2017); *Pertile v. Gen. Motors, LLC,* 2017 WL 4237870, at *2 & n.3 (D. Colo. Sept. 22, 2017). "The Court's view is partly informed by the fact that the procedure surrounding expert reports provides safeguards and indicia of reliability similar to those provided by sworn affidavits or declarations*;* and partly by the utterly formalistic nature of the objection, which has no bearing on whether 'a fact cannot be presented in a form that would be admissible in evidence,' Fed. R. Civ. P. 56(c)(2)." *Silverman,* 2019 WL 409340, at *11 (internal citations and quotation marks omitted).[1]  So, where cited, the Court will consider whether Powers' expert report creates a genuine issue of material fact.

Second, Lt. Faris argues that Sexton's Statement of Additional Disputed Facts fails to comply with the Court's Practice Standard directing that

> [i]f the party opposing the motion for summary judgment . . . believes there are additional disputed questions which have not been adequately addressed by the movant, the party shall, in a separate section of the party's brief styled "Statement of Additional Disputed Facts," set forth in simple declarative sentences, separately numbered and paragraphed, each additional material disputed fact which undercuts movant's claim that movant is entitled to judgment as a matter of law.  Each separately numbered and

---

[1] Notably, Lt. Faris has not filed a *Daubert* motion challenging the reliability of Powers' opinions.  *See* WJM Revised Prac. Standard III.H.2.a (Rule 702 motions "challeng[ing] expert evidence submitted in support of summary judgment briefing . . . must be filed contemporaneously with the summary judgment response or reply, as appropriate.").

> paragraphed fact shall be accompanied by specific reference to evidence in the record supporting the fact or demonstrating that it is disputed.

WJM Revised Practice Standard III.F.5. Sexton's Statement of Additional Facts consists of just one paragraph, stating the following:

> With the exception of the foregoing statement, the plaintiff stands on his response to defendant's statement of material fact set forth in Exhibit 2, the declaration of Mr. Sexton and asks to accept ¶¶ 1–21 of Exhibit 2, as if fully set forth herein.

(ECF No. 90 at 5 ¶ 1.)

The Court agrees with Lt. Faris that Sexton's general incorporation of an entire exhibit is not in keeping with the Court's Practice Standards and is surely a reflection of sloppy lawyering. Moreover, it is unclear to the Court what Sexton means in stating his intent to "stand[] on his response to defendant's statement of material fact set forth in Exhibit 2," as Sexton has separately set forth his admissions and denials to Lt. Faris's Statement of Material Facts in his response brief. (*See* ECF No. 90 at 2–5.)

On the other hand, Sexton also cites his declaration in response to Lt. Faris's Statement of Material Facts, such that the Court will refer to his declaration as summary judgment evidence at any rate. (*See, e.g.,* ECF No. 90 at 3–5 ¶¶ 19, 30, 33–34.)[2] So, while the Court looks poorly upon this failure to adhere to its Practice Standards, it will nevertheless consider any additional, material facts set forth in Sexton's declaration in its analysis below.

---

[2] As a substantive matter, it is worth noting that Lt. Faris's Statement of Material Facts is similarly a virtual word-for-word recitation of his declaration. (*Compare* ECF No. 86 at 2–8 *with* ECF No. 86-1.)

3

## II. BACKGROUND[3]

In August 2020, the Denver Department of Public Health and Environment ("DDPHE") declared a public health hazard at an unlawful encampment located at the 2200 block of Champa Street, in the City and County of Denver. (ECF No. 86 at 2 ¶ 1.) DDPHE requested that the Denver Department of Transportation and Infrastructure ("DOTI") assist with a cleanup of the location. (*Id.* at 2 ¶ 2.)

The cleanup operation commenced in the morning hours of August 25, 2020, around 7:00 or 8:00am. (*Id.* at 3 ¶ 7.) Denver Police Department ("DPD") officers, supervised by Lt. Faris, provided protection for City employees during the cleanup. (*Id.* at 2 ¶¶ 3, 4.) Lt. Faris directed officers to set up a perimeter with yellow tape around the operation to serve as a barrier between protestors and the civilian City employees carrying out the cleanup. (*Id.* at 3 ¶¶ 8, 9; *see also* ECF No. 90-2 at 1 ¶ 6.) And, indeed, shortly after the perimeter was set up, protestors arrived and began protesting the removal of the encampment. (ECF No. 86 at 3 ¶ 11.) They were permitted to voice their displeasure with DPD and the cleanup operation so long as they stayed behind the established perimeter. (*Id.* at 3 ¶ 12.)

Sexton, specifically, arrived at the protest around 10:30am. (ECF No. 90-2 at 1 ¶ 5.) He is clearly depicted in the bodycam footage submitted by the parties wearing shorts and a white t-shirt. (ECF No. 86 at 4 ¶ 20; *see also, e.g.,* ECF No. 86-5 at 42:14–23.) At the time of the incident in question, Sexton was a video journalist and

---

[3] The following factual summary is based on the parties' briefs on the Motion and documents submitted in support thereof. These facts are undisputed unless attributed to a party or source. All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

4

owner of a YouTube channel, Pikes Peak Accountability, on which he published videos of public concern.  (ECF No. 86 at 1 ¶ 2.)  He went to the protest "to video the protest and to publish it for the community and to protest the often-heavy-handed tactics by Denver Police in tearing down homeless people's temporary housing structures."  (*Id.* at 1 ¶ 4.)  Sexton began filming the protest immediately upon his arrival.  (*Id.* at 1 ¶ 5.)  He was aware that the yellow tape demarcated a police line that he was not permitted to cross.  (*Id.* at 3 ¶ 10.)

The protest continued peacefully and without incident for over two hours.  (*Id.* at 3 ¶ 13.)  Lt. Faris submits, however, that at least some of the protestors' chants became increasingly provocative, including those of at least one protestor who began chanting, "Only good cop is a dead cop."  (*Id.* at 3 ¶ 14.)  He avers that such chants were "concerning because they raised the possibility that the protest of the encampment removal could become violent," (ECF No. 86-1 at 2 ¶ 16), though the parties dispute whether the chants are fairly characterized as "threats," (ECF No. 90 at 3 ¶ 14 (disputing that the chants were "true threats")).

At any rate, soon thereafter, a protestor breached the perimeter by walking under the yellow tape.  (ECF No. 86 at 4 ¶ 16; ECF No. 86-5 at 1:49:05.)  Moments later, one or more of the protestors tore the yellow police tape establishing the perimeter, though it is unclear from the video evidence whether that act was intentional or inadvertent.  (ECF No. 86-5 at 1:49:08–10.)  Either way, several protestors—including Sexton—appeared to seize on the opportunity to progress slowly forward beyond the previously established perimeter.  Sexton took several steps inside the previously-marked perimeter and linked arms alongside four other protestors whilst continuing to film the

5

police.  (*Id.* at 1:49:43–50.)  Several seconds later, the line of linked protestors—with still others following just beyond them—took several more steps forward toward police.  (*Id.* at 1:50:10–19.)

At that point, officers picked up the broken police line and appeared to begin attempting to reconnect the yellow tape to prevent the protestors from advancing still further.  (*Id.* at 1:50:24–34.)  Then, the protestors linked arm-in-arm, still including Sexton, veered to the far right of the police line, in what appears to the Court to have been an attempt to flank or otherwise proceed further beyond the police.  (*Id.* at 1:51:14–18.)  At that point, an officer on the line began shoving the protestors back.  (*Id.* at 1:51:19–26.)

Lt. Faris avers that, based on the conduct of the linked line and his experience, he had reason to believe that the protestors would attempt to interfere with cleanup operations.  (ECF No. 86 at 5 ¶ 26.)  He directed officers to arrest one of the protestors, who had broken the police line, in the "linked up" line.  (*Id.* at 5 ¶ 27.)  Sexton does not dispute that other protestors then became aggressive and attempted to interfere in the arrest by holding onto the man.  (*Id.* at 5 ¶ 28.)

Throughout the incident, Sexton is clearly captured on video filming the encounter in exceedingly close proximity to the officers.  (*See generally* ECF No. 86-6.)  Indeed, for a matter of seconds, Sexton stood so close to the officers that his mid-section was pushing up against an officer who was actively attempting to push protestors back:

6



(*Id.* at 00:00:17.)  Notably, the video footage shows that the police perimeter had previously extended to the light pole depicted in the background of the foregoing still. Moreover, the Court takes judicial notice of the fact that this incident occurred in August 2020, during the height of the COVID-19 pandemic, and prior to the public rollout of an effective vaccine in December of that year.

As officers were attempting to hold the police line, a water bottle was thrown by protestors in the general direction of the officers, though it fell to the ground without hitting anyone.  (ECF No. 86 at 7 ¶ 31.)  Lt. Faris submits that it is at this point that he decided to deploy Oleoresin Capsicum ("OC") spray, *i.e.*, pepper spray, to create distance between the protestors and the police so the perimeter could be reestablished.

7

(*Id.* at 8 ¶ 32.; *see also id.* at 2 ¶ 5.) Capsaicin, the active ingredient in pepper spray, irritates the eyes to cause burning and pain sensations and temporary blindness. (*Id.* at 2–3 ¶ 6.) It is used as a less lethal weapon in policing, riot control, crowd control, and self-defense, including defense against dogs and bears. (*Id.*) Its inflammatory effects cause the eyes to close, temporarily taking away vision. (*Id.*)

While Lt. Faris avers it was his intent to disperse a crowd that had become violent and he did not hear Sexton say anything (*id.* at 8 ¶ 34; ECF No. 93 at 10 ¶ 19), Sexton submits that Lt. Faris's act of pepper spraying him was an angry reaction to a statement that Sexton made about police behavior (ECF No. 90 at 4–5 at ¶¶ 32–33.) Moreover, according to Sexton's version of the events, he "respected the yellow tape barrier the entire time and stayed on the requested side of the barrier as directed by the police," was never aggressive with anyone at the protest, and, if he did have physical contact with any police officer, "it was incidental contact on the day in question and [] was in no way threatening or violent with anyone at the protest." (ECF No. 90-2 at 2 ¶¶ 7, 9.)

Irrespective of Lt. Faris's intent in deploying pepper spray, it appears to have been successful in pushing back the crowd and enabling officers to reestablish the overrun police perimeter. (ECF No. 87 at 8 ¶ 36.)

Remaining in this lawsuit are Sexton's claims against Lt. Faris for excessive force in violation of the Fourteenth Amendment (ECF No. 63 at ¶¶ 66–87 (First Claim)) and retaliation in violation of the First Amendment (*Id.* at ¶¶ 104–115 (Third Claim)). (*See also* ECF No. 77 (dismissing with prejudice First Amendment denial of free speech claim, municipal liability claim, and all claims against Defendant John Doe 1).) Lt. Faris

8

now moves for summary judgment on both claims. (*See generally* ECF No. 86.)

### III. LEGAL STANDARDS

**A.  Rule 56**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997). Courts view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

**B.  Qualified Immunity**

"The doctrine of qualified immunity shields government officials . . . from liability for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Buck v. City of Albuquerque,* 549 F.3d 1269, 1277 (10th Cir. 2008) (citation omitted). "A § 1983 defendant's assertion of qualified immunity is an 'affirmative defense [that] creates a presumption that the defendant is immune from suit.'" *Truman v. Orem City,* 1 F.4th 1227, 1235 (10th Cir. 2021) (alteration in original) (quoting *Est. of Smart by Smart v. City of Wichita,* 951 F.3d 1161, 1168 (10th Cir. 2020)).

"When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2)

9

the constitutional right was clearly established." *Martinez v. Beggs,* 563 F.3d 1082, 1088 (10th Cir. 2009). Thus, Sexton must show that (1) Lt. Faris's alleged conduct violated his constitutional rights and (2) "that Supreme Court or published Tenth Circuit cases, or the weight of authority from other courts, existing at the time of the violation, clearly established that such conduct constituted a violation of that right." *Baca v. Cosper,* 128 F.4th 1319, 1325 (10th Cir. 2025).

## IV. ANALYSIS

### A.     Excessive Force—Fourteenth Amendment (First Claim)

Lt. Faris argues he is entitled to qualified immunity on Sexton's first claim for excessive force in violation of the Fourteenth Amendment. (ECF No. 86 at 14–18.) The Court agrees that summary judgment is warranted because Sexton has wholly failed to address the legal standard applicable to his Fourteenth Amendment claim or direct the Court to evidence related to that standard. Thereby, Sexton has failed to establish a constitutional violation. The Court accordingly does not reach the second prong of the qualified immunity analysis.

As pertinent procedural background, the Court notes that Sexton's original complaint alleged a "Fourth and Fourteenth Amendment Violation" for "Excessive and Unreasonable Force." (ECF No. 1 at 15.) Thereafter, however, Sexton filed an amended complaint (the "FAC"), which alleged only a Fourteenth—and not a Fourth—Amendment excessive force claim. (ECF No. 33 at 25.) In response to Defendants' subsequent motion to dismiss the FAC, Sexton appeared to "recogniz[e]" that the use of force by Lt. Faris "fail[ed] to evolve into a seizure." (ECF No. 37 at 5.) In light of this concession, the Court explained in its corresponding dismissal Order that "the substantive due process analytical framework" applied to Sexton's Fourteenth

10

Amendment excessive force claim.  (ECF No. 62 at 12; *see also* ECF No. 77 at 9 (reiterating same).)  *See also Roska ex rel. Roska v. Peterson,* 328 F.3d 1230, 1243 (10th Cir. 2003) ("Claims that state actors used excessive force—deadly or not—in the course of a seizure are analyzed under the Fourth Amendment's reasonableness standard. . . . Substantive due process analysis is appropriate in cases that involve excessive force where a specific constitutional provision—such as the Fourth or Eighth Amendment—does not apply.") (citations omitted); see also *Huff v. Reeves,* 996 F.3d at 1092 (10th Cir. 2021) ("Because Ms. Huff's excessive-force claim against Reeves alleges a prearrest *seizure*, . . . it is properly analyzed under the Fourth, rather than the Fourteenth, Amendment.") (emphasis in original).

Sexton's operative SAC continues to allege only that Lt. Faris "deprived [him] of his *Fourteenth* Amendment protection from excessive use of force that amounts to governmental action which is arbitrary or 'shocks the conscience'" when Lt. Faris "recklessly, willfully, maliciously, and intentionally attack[ed] [Sexton] without provocation by spraying him in the face with pepper spray."  (ECF No. 63 at ¶¶ 68, 69 (emphasis added).)  Yet, in opposition to the Motion, Sexton argues that he has a triable *Fourth* Amendment claim, further asserting for the first time that "[h]e was seized under the fourth amendment [*sic*] when he was pepper sprayed in his eyes by Lt. Faris and was temporarily disabled and fell to the floor."  (ECF No. 90 at 9.)

Sexton "cannot change the entire theory" of his excessive force claim "in [his] response to a motion for summary judgment."  *Getzel v. ATS Specialized, Inc.,* 2024 WL 446038, at *6 (D. Colo. Jan. 19, 2024).  Though "some courts treat new claims first raised in a response to summary judgment as a constructive motion to file an amended

11

complaint," "such an amendment is permissible only where 'a late shift in the thrust of the case will not prejudice the other party in maintaining its defense.'" *Id.* (quoting *Ahmad v. Furlong,* 435 F.3d 1196, 1202 (10th Cir. 2006)). The Court can imagine circumstances under which it might be reluctant to preclude a § 1983 plaintiff from proceeding on an otherwise viable excessive force claim based on something as relatively formalistic as whether that claim is better labeled as a Fourth or Fourteenth Amendment violation.

But, under the circumstances here, permitting Sexton to yet again shift the legal theory underpinning his excessive force claim at this late stage would surely prejudice Lt. Faris. As noted above, Sexton has already been afforded numerous opportunities to amend his complaint, and he expressly argued in prior filings that his excessive force claim was *not* predicated on a seizure. Based on these representations, the Court has (twice) expressly instructed Sexton that the Fourteenth Amendment substantive due process analytical framework—not the Fourth Amendment objective reasonableness standard—governs his claim. (ECF No. 62 at 12; *see also* ECF No. 77 at 9 (reiterating same).)[4] Despite this, his opposition wholly fails to address whether there is sufficient evidence upon which a jury could reasonably conclude that Lt. Faris's conduct amounts to a Fourteenth Amendment violation under the applicable "conscience-shocking" standard. *Roska,* 328 F.3d at 1243.

For these reasons, the Court finds that Sexton has failed to raise a genuine issue of material fact precluding summary judgment on his Fourteenth Amendment excessive

---

[4] Sexton himself appears to plead his Fourteenth Amendment claim in conjunction with this standard (*see, e.g.,* ECF No. 63 at ¶¶ 68, 72, 74, 78)

force claim under the appropriate legal standard, and the Court otherwise declines to analyze his excessive force claim as an (unpleaded) Fourth Amendment violation. *Cf. Cousik v. City & County of Denver,* 2024 WL 896755, at *6 (D. Colo. Mar. 1, 2024) (same); *Shaw v. City of Norman,* 2023 WL 2923962, at *4 (10th Cir. Apr. 13, 2023) (affirming district court's dismissal of claim for violation of substantive-due-process rights where "plaintiffs make no attempt to satisfy [the applicable] standard"). The Motion is thus granted as to Sexton's first claim for relief against Lt. Faris.

**B.    Retaliation—First Amendment (Third Claim)**

Lt. Faris additionally contends that he is entitled to summary judgment on Sexton's third claim for retaliation in violation of the First Amendment. (ECF No. 86 at 10–14.) The Court agrees with Lt. Faris that summary judgment is appropriate at least because Sexton has failed to establish a genuine issue of material fact as to the first element of his First Amendment retaliation claim. Having thus failed to establish a constitutional violation, the Court again does not reach the second prong of the qualified immunity analysis.

To prove a claim of retaliation for the exercise of First Amendment rights, Sexton must establish "(1) that [he] was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Worrell v. Henry,* 219 F.3d 1197, 1212 (10th Cir. 2000) (quotations omitted); *see also Fenn v. City of Truth or Consequences,* 983 F.3d 1143, 1148 (10th Cir. 2020) (same).

As to the first element, Sexton alleges in the SAC that he "lawfully exercised his

13

right to free speech under the First Amendment, by videotaping the abusive treatment of Denver citizens by the Denver Police Department and verbally calling out this misconduct in an effort to prevent further violations." (ECF No. 63 at ¶ 106.) Lt. Faris does not dispute "that members of the public have a right to film the police." (ECF No. 86 at 11.) *See also Irizarry v. Yehia,* 38 F.4th 1282, 1288 (10th Cir. 2022) ("recogniz[ing] a First Amendment right to film the police performing their duties in public"). It is further well-established that "the First Amendment protects both the right to criticize police, and the right to remain in the area to be able to criticize observable police conduct." *Manchas v. City & County of Denver, Colo.,* 2024 WL 6475779, at *5 (D. Colo. Apr. 5, 2024) (citing *Jordan v. Jenkins,* 73 F.4th 1162, 1169 (10th Cir. 2023)).

Nevertheless, Lt. Faris argues these First Amendment rights are "subject to reasonable time, place and manner restrictions"—restrictions with which Sexton failed to comply here. (ECF No. 86 at 11.) *See Irizarry,* 38 F.4th at 1292 n.10 (the First Amendment right to film the police "is subject to reasonable time, place, and manner restrictions"); *Glik v. Cunliffe,* 655 F.3d 78, 84 (1st Cir. 2011) ("To be sure, the right to film is not without limitations. It may be subject to reasonable time, place, and manner restrictions.").

"It goes without saying that the police may take all reasonable steps to maintain safety and control, secure crime scenes and accident sites, and protect the integrity and confidentiality of investigations." *ACLU of Ill. v. Alvarez,* 679 F.3d 583, 607 (7th Cir. 2012). Thus, "[w]hile an officer surely cannot issue a 'move on' order to a person *because* he is recording, the police may order bystanders to disperse for reasons related to public safety and order and other legitimate law-enforcement needs." *Id.*

14

(emphasis in original). Similarly, the right to criticize the police may be limited (1) "if criticism is accompanied by a physical act which interferes with an officer's official duties;" (2) "if the act of criticizing itself is so loud that an officer is prevented from executing his or her duties;" and (3) "if criticism of an officer has the function of coaching a witness." *Jordan,* 73 F.4th at 1170. "Under these circumstances, an officer may lawfully restrict criticism based on its interference with police work." *Manchas,* 2024 WL 6475779, at *5; *see also Irrizary,* 38 F.4th at 1292 n.10 (acknowledging that the right to "loudly criticize" police is subject to the condition that such criticism do "not impede officers from performing their duties").

Turning to the facts at issue in this case, there is no dispute that the cleanup of the homeless encampment and, likewise, the protest of those efforts took place on a public street—"a traditional public forum where 'the rights of the state to limit the exercise of First Amendment activity are 'sharply circumscribed.'" *Id.* (quoting *Glik,* 655 F.3d at 84) (internal citation omitted). (ECF No. 86 at ¶ 1.) But, it is also undisputed (1) that the area immediately surrounding the cleanup operations was enclosed by a police perimeter demarcated with yellow tape, (2) that Sexton was aware that the yellow tape comprised a police line that he was not permitted to cross, and (3) that protestors were otherwise permitted to protest freely so long as they respected that perimeter. (*Id.* at 3 ¶¶ 8–13.)

Important to the Court's decision on this claim is the fact that Sexton does not argue that the police perimeter was an unreasonable place restriction on his First Amendment rights. Instead, he argues, in conclusory fashion, that he did not "violate any reasonable time, place, or manner restrictions on his First Amendment activity on

15

that day." (ECF No. 90 at 12.) As best the Court can discern, this assertion rises and falls on Sexton's averment that he "never breached the yellow tape barrier." (*Id.* at 5.)

While it may be true that Sexton was not directly responsible for tearing down the yellow tape, the Court is hard-pressed to find that this necessarily means he did not violate the police perimeter. The video evidence unequivocally establishes that, after the yellow tape was torn down, Sexton linked arms with a group of additional protestors and pressed forward beyond the perimeter's previously established boundary. While officers endeavored to prevent the protestors from proceeding further, Sexton continued to film the encounter while standing so close to an officer that his mid-section was pressed up against them. (ECF No. 86-5 at 00:00:17.) Regardless of whether Sexton subjectively intended this physical encroachment to be an act of aggression or not, the Court finds that no reasonable jury viewing the video evidence could credit Sexton's characterization that he "was scrupulously observing the perimeter" and posed no impediment to the officers' performance of their official duties in the moments before he was pepper sprayed. (ECF No. 90 at 4 ¶ 30.)

Indeed, these facts are a far cry from those where courts have found that the plaintiff successfully alleged a violation of their First Amendment right to film. *See Irizarry,* 38 F.4th at 1292 n.10 (observing there was "no 'time, place, and manner' restriction issue because a 'peaceful recording' of a traffic stop in 'a public space that does not interfere with the police officers' performance of their duties is not reasonably subject to limitation'"); *Fields v. City of Philadelphia,* 862 F.3d 353, 360 (3d Cir. 2017) (concluding that plaintiffs enjoyed constitutional right to record without limitation where one "took a photograph across the street from where the police were breaking up a

16

party" and the other "moved to a vantage point where she could record a protestor's arrest, but did so without getting in the officers' way"); *Glik v. Cunniffe,* 655 F.3d 78, 84 (1st Cir. 2011) ("[T]he complaint indicates that Glik 'filmed [the officers] from a comfortable remove' and 'neither spoke to nor molested them in any way' (except in directly responding to the officers when they addressed him). [citation omitted.] Such peaceful recording of an arrest in a public space that does not interfere with the police officers' performance of their duties is not reasonably subject to limitation."); *Manchas,* 2024 WL 6475779, at *5 (finding "Plaintiff's conduct . . . remained well within the bounds protected by the First Amendment" where he "filmed the arresting officers and criticized their aggressive tactics from a public sidewalk" and "did not physically interfere with any officer, but stood a significant distance from the officers throughout the encounter").  By contrast, courts are more likely to find that officers are entitled to qualified immunity where, as here, the plaintiffs were filming officers in unnecessarily close proximity and in flagrant disregard of officer directives regarding where to stand.  *See, e.g., Hulbert v. Pope,* 70 F.4th 726, 737 (4th Cir. 2023) (holding officer was "entitled to qualified immunity for ordering [the plaintiff] to move off the sidewalk while he was filming" because the officer "reasonably could have believed that his order was consistent with any First Amendment right to film"; ""[t]he right to film police . . . was not the right to a close-up").

In sum, because (1) no reasonable jury could conclude that Sexton was exercising his First Amendment rights in due deference to the police perimeter and without interfering with the officers' performance of their official duties based on the unique factual circumstances and evidence presented here; and (2) he does not

otherwise challenge the police perimeter as an unreasonable restriction on his First Amendment rights, Sexton has failed to establish that he was engaged in constitutionally protected activity in the moments before he was pepper sprayed. The Motion is accordingly granted as to Sexton's third claim for relief against Lt. Faris.

## V. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Defendant Lt. Sean Faris's Motion for Summary Judgment (ECF No. 86) is GRANTED;

2. Judgment shall enter in favor of Lt. Faris and against Sexton on his first claim of excessive force in violation of the Fourteenth Amendment (ECF No. 63 at ¶¶ 66–87) and third claim of retaliation in violation of the First Amendment (*id.* at ¶¶ 104–115);

3. The action is DISMISSED WITH PREJUDICE; and

4. Each party shall bear their own fees and costs.

Dated this 9th day of December, 2025.

BY THE COURT:

_____
William J. Martínez
Senior United States District Judge